# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                  No. CR 18-3500 JB

LEON SALAZAR,

      Defendant.

## **MEMORANDUM OPINION AND ORDER**

**THIS MATTER** comes before the Court on the Defendant's Opposed Sealed Motion to Suppress Evidence, filed November 21, 2018 (Doc. 18)("Motion"). The Court held an evidentiary hearing on March 4, 2019. See Clerk's Minutes at 1 (taken March 4, 2019), filed March 6, 2019 (Doc. 37). The primary issues are: (i) whether Defendant Leon Salazar made statements to law enforcement officers on September 11, 2018, in a custodial setting without Miranda v. Arizona, 384 U.S. 436 (1966)("Miranda") warnings; (ii) whether the Court should suppress and forbid the introduction of statements or tangible evidence obtained as a result of Salazar's September 11, 2018, questioning, because State of New Mexico police officers violated Salazar's due process rights in obtaining Salazar's statements by using "coercion, intimidation, fear, and false or illusory promises or inducements," Motion at 1; and (iii) whether the Court should suppress statements Salazar made to the same officers on September 14, 2018. The Court concludes that: (i) Salazar's statements were not made during a custodial interrogation; (ii) the Court will suppress or forbid introduction into evidence of statements and tangible evidence obtained as a result of Salazar's statements, because Salazar's statements were coerced in violation of his due process rights; and (iii) the Court will not suppress Salazar's statements made at the September 14, 2018, interview,

because they were made voluntarily.  Accordingly, the Court grants in part and denies in part the Motion.

## FACTUAL BACKGROUND

Rule 12(d) of the Federal Rules of Criminal Procedure requires the Court to state its essential findings on the record when deciding a motion that involves factual issues.  See Fed. R. Crim. P. 12(d) ("When factual issues are involved in deciding a motion, the court must state its essential findings on the record.").  The findings of fact in this Memorandum Opinion and Order shall serve as the Court's essential findings for rule 12(d) purposes.  The Court makes these findings under rule 104(a) of the Federal Rules of Evidence, which requires a judge to decide preliminary questions relating to evidence's admissibility, including a search's or seizure's legality.  See United States v. Merritt, 695 F.2d 1263, 1269-70 (10th Cir. 1982).  In deciding such preliminary questions, the other rules of evidence, except those with respect to privileges, do not bind the Court.  See Fed. R. Evid. 104(a) ("The court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible.  In so doing, the court is not bound by evidence rules, except those on privilege.").  Thus, the Court may consider hearsay in ruling on a motion to suppress.  See United States v. Lopez-Carillo, 536 F. App'x 762, 768-69 (10th Cir. 2013)(unpublished)[1]("[T]he Supreme Court has made it clear hearsay is admissible in

---

[1] United States v. Lopez-Carillo is an unpublished opinion, but the Court can rely on an unpublished opinion for the United States Court of Appeals for the Tenth Circuit to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A) ("Unpublished opinions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated: "In this Circuit, unpublished orders are not binding precedent, . . . and . . . citation to unpublished opinions is not favored.  However, if an unpublished opinion . . . has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision."  United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court concludes that United States v. Lopez-Carillo; Appleby v. Cline, 711 F. App'x 459 (10th Cir. 2017); United States v. Varela, 576 F. App'x 771 (10th Cir. 2014); United States v. Sanchez-

suppression hearings. . . . As a result, the restriction in the Confrontation Clause against admission of testimonial statements . . . is not implicated here." (citing United States v. Matlock, 415 U.S. 164, 172-77 (1974); United States v. Sanchez, 555 F.3d 910, 922 (10th Cir. 2009); United States v. Miramonted, 365 F.3d 902, 904 (10th Cir. 2004))).

1.      On or around September 9, 2018, an individual ("citizen") was walking his dogs in an Española neighborhood when he came across a cellophane[2]-wrapped package (the "package"). See Supplemental Report #1 Agent Janice Madrid at 4 (dated Sept. 10, 2018), filed November 21, 2018 (Doc. 18-1)("Madrid Report"). See also Motion ¶ 1, at 2 (citing Madrid Report at 4); United States' Sealed Response in Opposition to Defendant's Motion to Suppress Evidence (Doc. 18) at 1, filed December 12, 2018 (Doc. 23)("Response").

2.      The package's dimensions were approximately six inches by six inches. See Madrid Report at 4; Response at 1.

3.      The citizen picked up the package, unwrapped it, and observed a black substance which he believed to be drugs. See Madrid Report at 4; Response at 1.

4.      The citizen took the package to a New Mexico State Police ("State Police") substation, where an officer told him to take it home and return with it the following day. Motion ¶ 2, at 2; Response at 1-2. See Transcript of Motion Hearing at 98:3-6 (Ray, Madrid)(taken

---

Gallegos, 412 F. App'x 58 (10th Cir. 2011); United States v. Crisp, 371 F. App'x 925 (10th Cir. 2010); and United States v. Sierra-Estrada, 248 F. App'x 973 (10th Cir. 2007), have persuasive value with respect to material issues, and it will assist the Court in its disposition of this Memorandum Opinion and Order.

[2]Cellophane is a thin, flexible, transparent plastic film used to, among other functions, wrap food and to act as adhesive tape. See Cellophane, Encyclopaedia Brittanica, https://www.britannica.com/technology/cellophane (last visited January 6, 2020).

September 20, 2018)("Tr.").

5.      On September 10, 2018, the citizen returned to the State Police substation, <u>see</u> Motion ¶ 3, at 2; Tr. at 9:16-22 (Trujillo), and spoke with Lieutenant Chris Valdez, a member of the State Police's Uniform Bureau for District 7, Española, New Mexico, who took custody of the package, <u>see</u> Madrid Report at 4; Response at 2.

6.      The citizen told Valdez that, upon his return from the State Police substation on September 9, 2018, a man, whom the citizen did not identify, arrived at his house and asked whether he had found a package, which the male individual told the citizen was for, or belonged to, his daughter.  <u>See</u> Madrid Report at 4; Response at 2.

7.      Valdez weighed the package and recorded an approximate weight of 646 gross grams, <u>see</u> Response at 2 (stating that the package's contents' approximate weight was 646 gross grams); Tr. at 9:16 (Trujillo)(stating that the amount was "over 600 grams"), repackaged it with its original wrapping, entered the package into the State Police tracker system, and secured it in the Española office's evidence vault, <u>see</u> Madrid Report at 4.

8.      Agent Janice Madrid is a State Police officer assigned to the Region 3 Narcotics Task Force ("Task Force").  Madrid Report at 4.

9.      The Task Force investigates narcotics and controlled substances cases -- including but not limited to heroin, methamphetamine, cocaine, marijuana, and pills -- by employing methods such as gaining confidential sources to conduct controlled purchases of narcotics or completing undercover purchases of narcotics to thereby begin an investigation.  <u>See</u> Tr. at 7:4-7 (Trujillo); <u>id.</u> at 7:10-13 (Trujillo).

10.     On September 10, 2018, another Task Force member, Lieutenant Scott McFaul, directed Madrid to contact Valdez about the package.  <u>See</u> Madrid Report at 4; Tr. at 96:15-22

(Madrid).

11.     Madrid and Gabriel Trujillo, another Task Force member, <u>see</u> Tr. at 6:13-14 (Trujillo), arrived at the Española office to meet with Valdez, <u>see</u> Tr. at 10:8-10 (Trujillo); <u>id.</u> at 96:25-97:4 (Madrid).

12.     Trujillo and Valdez identified Salazar as a person of interest, because they knew Salazar lived in the area where the citizen found the package and that he was previously associated with narcotic use and distribution.  <u>See</u> Madrid Report at 4; Motion ¶ 5, at 2; Response at 2 (stating that Valdez identified Salazar).  <u>See</u> <u>also</u> Tr. at 10:24-11:7 (Houghton, Trujillo)(stating that Trujillo connected the package to the area around Salazar's home, and that Trujillo and Valdez realized Salazar had prior narcotics involvement).

13.     Valdez briefed Madrid and then turned the sealed package over to her.  <u>See</u> Madrid Report at 5; Response at 2; Tr. at 97:13-14 (Madrid).

14.     Madrid unsealed the package, observed a black tar-like substance, and detected a distinct order.  <u>See</u> Madrid Report at 5.

15.     Because of her law enforcement training, Madrid believed the substance to be heroin.  <u>See</u> Madrid Report at 5.

16.     Madrid field-tested the contents, using a test specifically for heroin, and obtained a presumptively positive identification for heroin.  <u>See</u> Madrid Report at 5; Motion ¶ 4, at 2; Response at 2; Tr. at 97:21-22 (Madrid).

17.     Madrid, Trujillo, and Valdez learned that Salazar was on supervised probation and that he had his next appointment with his Probation Officer ("PO"), Manuel Vasquez, on September 11, 2018.  Madrid Report at 5; Motion ¶ 6, at 2; Response at 2; Tr. at 11:5-8 (Trujillo);

id. at 11:12-16 (Houghton, Trujillo).

18.     Salazar was born in 1987.  See Salazar's Criminal History, at 4.

19.     Madrid and Trujillo contacted Vasquez to ask if they could interview Salazar before his regularly scheduled meeting with Vasquez, and Vasquez assented.  See Madrid Report at 3; Tr. at 12:2-5 (Trujillo); id. at 117:25-118:6 (Vasquez).

20.     Madrid and Trujillo went to the Española District Office of the Probation and Parole Division of the New Mexico Corrections Department ("Española Probation Office") to meet with Salazar during his regularly scheduled meeting with Vasquez.  See Madrid Report at 6; Response at 2; Tr. at 11:8-11 (Trujillo); id. at 12:2-6 (Trujillo).

21.     By September 11, 2018, Salazar had been reporting to the Española Probation Office for over two years.  See Motion ¶ 9, at 3.

22.     Each time an individual reports to the Española Probation Office: (i) he or she checks in with a secretary at a glass window near the front door and signs in; (ii) the secretary then informs the PO that the reporting individual has arrived; and (iii) a PO arrives to the hallway entrance door to all of the PO offices, which is locked, and escorts the reporting individual back to his or her PO's office.  See Tr. at 119:18-120:4 (Vasquez); Motion ¶ 9, at 3.

23.     On September 11, 2018, Salazar's girlfriend drove him to the Española Probation Office for his mandatory meeting with Vazquez.  See Motion ¶¶ 7-8, at 2-3 (citing Photograph from Outside of Probation Office (undated), filed November 21, 2018 (Doc. 18-2)("Española Probation Office Outside Photograph")); New Mexico Corrections Department Policy CD-052800 -- Parole/Probation Absconders at 1 (dated Feb. 21, 1994), filed November 21, 2018 (Doc. 18-3)("Probation/Parole Policy")(stating the consequences for failing to report while on

probation).

24.     The Española Probation Office is located in a commercial complex, and it is not attached to a police precinct or a jail.  See Tr. at 26:6-18 (Houghton, Trujillo).

25.     Salazar's girlfriend waited in the car while he went in to report.  See Motion ¶ 7, at 3; Tr. at 38:14-17 (Houghton, Trujillo).

26.     Vasquez did not tell Salazar that Madrid and Trujillo would be there to meet with him.  See Tr. at 118:19-21 (Ray, Vasquez).

27.     Madrid and Trujillo intentionally arrived at the Española Probation Office before Salazar, so that neither Salazar nor anyone else would see them and infer their purpose for being there.  See Tr. at 100:4-101:1 (Madrid); Response at 3.

28.     When Salazar arrived, Vasquez greeted him, informed him that State Police officers wished to speak with him, told him to go into the break room, and escorted him there, leaving and closing the door behind him without locking the door.[3]  See Madrid Report at 6; Motion ¶¶ 12-13, at 3-4; Response at 3; Tr. at 119:1-7 (Vasquez).

29.     Madrid and Trujillo were in plain clothes, were unarmed[4] and had no handcuffs on their persons -- their firearms and handcuffs were locked in their department-issued vehicle -- and were sitting at a table when Salazar entered the room.  See Response at 3; Tr. at 25:5-10 (Trujillo):

---

[3]Trujillo, at the hearing, stated that he closed the door after the start of the interview in response to a gesture which Salazar made, indicating that Salazar wanted the door closed, and for privacy reasons.  See Tr. at 26:10-27:15 (Trujillo, Houghton).  Vasquez indicated that he closed the door after he left Salazar in the room with Madrid and Trujillo.  See Tr. at 112:13-19 (Vasquez).

[4]Although the Motion states that the officers "were in uniform, and were visibly armed," Motion ¶ 13, at 4, Salazar's counsel has since clarified that this statement was untrue, and that Madrid and Trujillo were in plain clothes and were unarmed, see Tr. at 130:1-5 (Ray).

id. at 25:15-24 (Houghton, Trujillo); id. at 100:20-22 (Madrid); id. at 101:8-16 (Madrid).

30. Madrid and Trujillo spoke with Salazar throughout the interview in neutral, calm, conversational tones. See generally Recording at 00:00-45:05.

31. The interview in the break room lasted approximately forty-five minutes and took place without Vasquez present. See Madrid Report at 6; Response at 3; Motion ¶ 15, at 4; Tr. at 121:14-16 (Ray, Vasquez).

32. The room in which Salazar was interviewed is a break room for probation officers, see Tr. at 121:10 (Vasquez); it contains a refrigerator, a microwave, a television, and a water cooler, see Break Room Photographs at 1-8, filed December 12, 2018 (Doc. 23-1)(depicting room with two small windows,[5] table, water cooler, refrigerator, microwave, television, and water cooler)("Break Room Photographs"). See also Response at 3-4; Tr. at 15:10-18:21 (Trujillo, Houghton)(describing the layout of the break room and the various items within it).

33. Salazar sat at the table with Trujillo and Madrid; Salazar sat near one of two windows. See Tr. at 27:16-17 (Trujillo).

34. During the interview, the door to the room was closed, but not locked. See Tr. at 29:10-15 (Houghton, Trujillo); id. at 39:21-40:2 (Trujillo); id. at 89:22-23 (Trujillo); id. at 121:13 (Vasquez); Madrid Report at 4.

35. During the interview, Salazar sat at a table with Trujillo and Madrid, and Salazar's seat was next to the door and a window. See Madrid Report at 4; Tr. at 16:21-17:15 (Trujillo,

---

[5]The Motion describes the room as windowless, see Motion ¶ 13, at 3, but the Court concludes that there are windows in the room, see Break Room Photographs at 8 (depicting two windows).

Houghton).

36.     Trujillo and Madrid began by introducing themselves as State Police Officers and Task Force members.  See September 11, 2018 Recording at 00:13-00:29 (admitted at March 4, 2019 hearing as United States Ex. 1-A)("Recording"); Transcription of September 11, 2018 Interview of Leon Salazar at 2:14-16 (Trujillo, Madrid), filed January 25, 2019 (Doc. 29)("Sept. 11 Tr."); Motion ¶ 16, at 4.

37.     Madrid asked Salazar, "[s]o, I think you know why we're here, right?" and told Salazar they were there to "talk about, you know, something that you might've lost."  Recording at 00:30-00:42; Sept. 11 Tr. at 3:2-6 (Madrid, Salazar).  See Motion ¶ 17, at 4; Madrid Report at 4.

38.     Salazar denied having lost anything.  See Recording at 00:43-00:45; Sept. 11 Tr. at 3:8 (Salazar).  See also Madrid Report at 4.

39.     Madrid asked Salazar whether his DNA would be on a package that the State Police found and asked whether Salazar would object to providing another DNA sample; Salazar said he would not object.  See Recording at 02:06-02:19; Sept. 11 Tr. at 7:8-15 (Madrid)("Is your DNA gonna come back on my package?"); id. at 7:9-15 (Madrid, Salazar).  See also Madrid Report at 4.

40.     Madrid also asked Salazar whether neighbors' surveillance cameras would have footage of Salazar searching for the package.  See Recording at 02:19-02:40; Sept. 11 Tr. at 8:6-19 (Madrid, Salazar).  See also Motion ¶ 19, at 4.

41.     Further into the conversation, Madrid told Salazar that he was "gonna owe people money for that heroin, bro."  Recording at 03:44-03:47; Sept. 11 Tr. at 10:17 (Madrid).  See Madrid

Report at 5.  See also Motion ¶ 20, at 5.

42.  Salazar responded that he did not owe anyone money.  See Recording at 03:48-03:52; Sept. 11 Tr. at 10:18 (Salazar).

43.  Madrid told Salazar: "Somebody is gonna come collecting for that, for that fuckin' dope.  And then what are you gonna do?"  Recording at 04:05-04:09; Sept. 11 Tr. at 11:9-10 (Madrid).  See Motion ¶ 20, at 5.

44.  Trujillo said: "[L]ike the, the cars that you have and you don't have a job, apparently.  You know what I mean?"  Recording at 04:20-04:27; Sept. 11 Tr. at 11:16-17 (Trujillo).  See Madrid Report at 5.

45.  Salazar responded that he worked and that he had sold possessions, including cars and motorbikes, for money.  See Recording at 04:30-05:10; Sept. 11 Tr. at 12:1-16 (Salazar, Trujillo).

46.  Trujillo told Salazar: "Well, that's the whole issue is that like it doesn't add up . . . .  You know? As far as what we know."  Recording at 05:11-05:15; Sept. 11 Tr. at 12:17 (Trujillo).

47.  Madrid told Salazar: "You know that in the end . . . we find out . . . who . . . what things belong to, right?  And who things belong to, right?"  Sept. 11 Tr. at 16:7-15 (Madrid).

48.  Madrid told Salazar: "I'm tryin' to share information, from, with you, bro, so you don't go back to jail, so you don't go back to prison.  So you don't become that habitual offender, bro."  Recording at 07:47-07:55; Sept. 11 Tr. at 17:11-12 (Madrid); Motion ¶ 22, at 5.

49.  She continued: "But look, it's simple, dude, it's simple.  I see that you're doing bits and pieces to try to work your life, cool.  I can work with that, bro, seriously.  But what I can't work with is somebody who sits here and just denies and lies because they think they're gonna

win again because they're clean." Sept. 11 Tr. at 17:13-17 (Madrid).

50. Later in the conversation, Madrid stated: "Listen to me, I'm telling you, I know where that dope belongs and I know who it belongs to." Recording at 08:35-08:41; Sept. 11 Tr. at 17:22 (Madrid). See Madrid Report at 5.

51. Madrid then said: "I'll tell you one thing, is my word, it stands. You know what I mean? And I'm not looking for you, bro. I'm not looking for you. I'm looking for the main man, bro, the main man," and that she and Trujillo would not do anything to get Salazar hurt or to put him "in the switch." Recording at 09:03-09:11; Sept. 11 Tr. at 18:7-8 (Madrid); id. at 18:10-11 (Madrid)("I'm not gonna do anything to get you hurt or put you in the switch or whatever. You know what I mean? I don't do that, okay? But the only person who can per, put somebody in the switch, is you, bro."). See Motion ¶ 22, at 5. See also Madrid Report at 5.

52. Madrid then asked Salazar how many kids he has. See Recording at 09:30-09:58; Sept. 11 Tr. at 18:12-21 (Madrid, Salazar)("You got four kids, right? Cuz you got a newborn, right?" "A newborn, yeah"); Motion ¶ 23, at 5.

53. Madrid then told Salazar: "Four kids, dude. Wasn't too long ago that we handled a case down here with somebody's head cut down, off. A guy and a girl . . . It wasn't too long ago before I dug up three bodies in Albuquerque, bro. So I'm tellin' you, dude, people don't play. You got a nice car, they're gonna be targeting you, man." See Recording at 09:30-09:58; Sept. 11 Tr. at 18:15-20 (Madrid, Salazar); Motion ¶ 23, at 5.

54. Later, Madrid told Salazar that, "I'll be honest with you, bro, if you're comfortable doing your time in jail, I'm comfortable putting you there, bro. But I don't wanna do that and it's simple, it's very simple." Sept. 11 Tr. at 19:18-20 (Madrid).

55. Madrid said to Salazar that, "what's simple is that there's only gonna be one time

- 11 -

in your life when the bus comes through and you can pick your seat because the next time the bus comes through, I'm gonna assign the seat." Sept. 11 Tr. at 20:4-6 (Madrid).

56.     Madrid told Salazar: "Fuck, look, look at what were you gonna do with this chick? Fuckin' leave her here without you, bro?  That kid needs a dad.  Or . . . that kid, that your chick, listen (unintelligible).  I have no problems taxing you both, and that's the straight up truth, man. I've no problem taxing you and taxing your chick.  No problems."[6] Sept. 11 Tr. at 20:10-12.  See Recording at 11:43-11:50.

57.     Referencing Salazar's habitual offender status, Madrid warned him that this offense would be his third strike and that "this shit potentially can go to the AUSA's office. . . . That's a lot of federal time, bro."  Recording at 12:58-13:12; Sept. 11 Tr. at 21:18-19 (Madrid).  See Motion ¶ 26, at 6.

58.     Salazar speculated that his ex-girlfriend might have told the police something, because she "begs" him "with that stuff," but that he does not know.  Recording at 13:17-13:41; Sept. 11 Tr. at 22:2-14 (Salazar, Madrid).  See Madrid Report at 5.

59.     Madrid implied to Salazar that their current interview would be the only opportunity which Madrid would provide him to tell his side of the story.  See Recording at 13:53-14:02; Sept. 11 Tr. at 23:3-4 (Madrid); Motion ¶ 27, at 6.

60.     After mentioning Salazar's girlfriend, Madrid said: "And now what's gonna happen

---

[6]According to the Sept. 11 Tr., Madrid told Salazar: "That kids needs a dad. Or . . . that kid, that, your chick, listen, (unintelligible) need fuckin' help, bro."  Sept. 11 Tr. at 20:10-12.  To the Court, it sounds as though Madrid is just as likely saying: "That kid needs a dad.  Or . . . that kid, that, your chick, listen, needs you in the fuckin' house, bro."  Recording at 11:43-11:50.  The Court, therefore, has designated that section as unintelligible.

when you and her get locked up?  Where's that little kid gonna go?"  Sept. 11 Tr. at 23:17-18.

62. 61.     She then told Salazar: "Where's that little girl gonna go?  Like I told you, bro, I, I don't play, man.  Like, I'm legit.  I will take care of you if you need taking care of, but . . . fuckin', I don't play."  Sept. 11 Tr. at 24:4-5 (Madrid).

62.     Madrid then assured Salazar that, unlike regular investigations officers or other officers who Salazar may have met, "[w]e don't work, uh, regular investigations" and  "what happens here with us, I don't share with anybody else."  Recording at 15:15-15:25; Sept. 11 Tr. at 24:15-18 (Madrid, Trujillo).

63.     Madrid then said: "But you know what?  I don't fuck people over, and I don't get people killed cuz I have a duty to protect the fuckin' kids of this community man."  Sept. 11 Tr. 25:11-12.

64.     Madrid told Salazar, "either you're gonna fuckin' be a man and own up to your shit or we move on and I find out, you know, where this dope came from."  Sept. 11 Tr. at 25:25-26:1.

65.     Madrid then told Salazar, "I ain't here to try to stick you . . . but I think you've got enough on your plate 'til 2021, right?  I can work with that shit like that (snap), they would love that stuff.  And that's the straight up truth, bro.  I can with that."  Sept. 11 Tr. at 26:2-4.

66.     Madrid told Salazar:

>    You're not listening cuz look at me, I didn't promise you anything, bro.  So you're not listening.  So that tells me you, you have been fucked over, you have been fucked over and you know what?  I'm sorry for that.  But I'll tell you one thing, bro, I, I fuckin' hold people accountable.  I hold myself accountable . . . .  Bro, I've done my shit too but I'm not here to promise you anything, but what I can tell you is that I can fuckin' easily forget about you.  I can easily forget about you here and let you just keep goin' on with your life.  Raising your kids, tryin' to get clean.  You're on probation . . . Or I can remember you . . . and I can go visit you

- 13 -

and I can listen to your jail calls and I can invade your privacy.
Recording at 17:45-18:08; Sept. 11 Tr. at 26:17-27:6 (Madrid, Salazar).  See Motion ¶ 29, at 7.

67.     Madrid threatened to arrest Salazar and his girlfriend, saying, "[a]side from you falling off a little bit, I fucking get it, man.  You are trying.  And I can either work with that or . . . like I said, bro, I have no problems takin' you both, taxing you both, I have no problems.  I don't wanna do that to either of you."  Sept. 11 Tr. at 27:10-12.

68.     Salazar asked Madrid during this line of questioning to "just help me get my kids" and said "[n]o, it that . . . I don't cry (unintelligible).  I just want my kids."  Sept. 11 Tr. at 27:19 (Salazar); id. at 28:1 (Salazar).

69.     Madrid told Salazar: "All, all you have to do is point me in the right direction"  "[a]re you willing to do that?"  Recording at 19:18-19:29; Interview at 28:2-4 (Madrid).  See Motion ¶ 28, at 6-7.

70.     Salazar began crying.  See Motion ¶ 28, at 6-7 (citing Recording at 19:10-19:35 (Salazar weeping); Sept. 11 Tr. at 28:5 ("Person weeping").

71.     At that point, Madrid told Salazar:

Because what's gonna happen, bro, when they come for their money for that heroin and you can't fuckin' come up with that dough even if you sell your shit, bro?  What's gonna happen?  You know what's gonna happen?  They're gonna chop off one of your kid's head [sic].  You're gonna ask for more time and you know what they're gonna do? They're gonna hurt you, bro.  And they're not gonna hurt you, they're gonna hurt somebody you love, you know that.

Recording at 19:36-20:02; Sept. 11 Tr. at 28:6-11 (Madrid). See Motion ¶ 28, at 6-7.

72.     Salazar began to repeat that he just wanted his kids and to live a normal life, and that he was a great dad.  See Recording at 20:05-41; Sept. 11 Tr. at 28:14-15 (Salazar, Madrid)("I could do whatever you guys want.  Like, I just wanna work.  I just wanna get my kids and just live a normal life."); id. at 28:17 ("All I want is my kids.  I did not do nothing to my kids."); id. at

28:21-22 ("I didn't touch nothing. (unintelligible). Just, all I want is my kids. I don't know how to do it. I just wanna be happy with my girlfriend and my kids."). <u>See also</u> Madrid Report at 5.

73.     As Salazar continued to talk about his kids, Madrid asked: "But . . . what about the heroin, bro? Was that a mistake?" <u>See</u> Sept. 11 Tr. at 28:20.

74.     Salazar asked Madrid what she wanted, and she responded that she wanted to know from where the heroin came. <u>See</u> Recording at 20:46-49; Sept. 11 Tr. at 29:2 (Salazar)("What do you want?"); <u>id.</u> at 29:3 (Salazar, Madrid)("I wanna know where that heroin came from. It's that simple. Like I told you, bro, I could forget about you very easily."). <u>See also</u> Madrid Report at 5.

75.     Madrid and Trujillo averred that their main objective "is to not get anybody killed, not to get anybody hurt," and expressed concern that a child might have found the heroin and overdosed. Recording at 21:41-22:30; Sept. 11 Tr. at 29:20-30:8 (Madrid, Trujillo).

76.     Salazar then stated: "Like, the only thing that I've done is, like, I've asked my neighbor. I was like, cuz my neighbor asked me to ask him if he had found a purse that's . . . whatever. He said a purse [unintelligible]." Recording at 22:31-42; Sept. 11 Tr. at 30:9-11 (Salazar). <u>See</u> Madrid Report at 5.

77.     Salazar stated that one neighbor asked him to ask a second neighbor if the second neighbor found a purse. <u>See</u> Recording at 22:44-23:10; Sept. 11 Tr. at 30:12-21 (Madrid, Salazar). <u>See also</u> Madrid Report at 5.

78.     Madrid asked Salazar what specific language he used to ask for the purse, and Salazar replied:

> Yeah, it was about eight, like eight or eight thirty and I was walkin' in and I heard a whistle so I turned around and I walked and he's all, "Hey, how's it goin'? So have you seen anything?" And I was all, "No," I was like, "seen what?" And I figured his dog cuz his dog is always in my fucking yard. And then he's all "No," he's all, "that's my hijita's purse," he's all, "a clear bag or something and it's all

purple." And I asked [m]y babe, I was like, "You haven't seen nothing?" And she's all, "No," she's all, "I haven't been here, I've been at my mom's," and her dad's cuz she was over there  And then uh, he goes, "Uh, yeah," he's all, "I [unintelligible]."  He's all, "Well, can you ask the neighbor?"  And I was like, "Well, didn't you ask him?"  And he's all, "No, I didn't want to go over there cuz he doesn't like me."  And I was like, "All right, if he doesn't like you, I'll go do it for you."  I was, "I guess").

So I walked over there and I knocked and like, I just knocked quiet cuz I didn't wanna do it for him so I knocked real quiet and then uh, he didn't get up right away.  I saw cuz he was like asleep on the couch I think when I was walkin' outside.  I tried to turn around and just walk off and I was like by this gate and then uh, he opened the door and was [unintelligible] the door, [unintelligible], "[Unintelligibl] I'm sorry," I said, "I was just neighbor."  I was all, "Uh, I'm just curious," I was, "you haven't seen a purse," I was all, "that has make-up in it?"  He was all, "No," he was all, "at all."  Cuz I saw him outside earlier that day just watering, like, irrigatin' his yard.  So, and I was like, all right.  So I figured maybe he would've seen it or whatever.  Cuz she walks up, she's young.  She's only like twelve or . . . well, maybe fifteen.  She's a little [unintelligible], I guess.  She's , she's only able to go to the bridge and back.  You know what I mean?  She can't pass the bridge so . . . .

[Unintelligible] and I saw him outside so [unintelligible] just be in this area.  The other two guys out there by me, it's an abandoned house and then uh, there's a doublewide and another doublewide but those guys are never home.  You know what I mean?  They're always at work and stuff.  And then I saw Dan there, so . . . I asked Dan.  But he said no, like, I mean [unintelligible].

Recording at 23:18-25:17; Sept. 11 Tr. at 31:6-32:4 (Salazar).

79.    Madrid told Salazar that his recounting was the first truthful information he had provided in the interview.  See Recording at 25:17-21; Sept. 11 Tr. at 32:7 (Madrid).  See also Madrid Report at 6.

80.    Madrid suggested that, if Salazar did not cooperate, she would investigate him further.  See Sept. 11 Tr. at 32:22-24 (Madrid)("There are some guys in this town that when they shit, I know what it smells like, bro.  That's straight up.  You know why?  Because that's how far

I'm up, up their ass. I don't wanna be like that with you.").

81. Madrid said to Salazar:

[B]ut you're thinking -- do I trust this bitch or not? And that's essentially on you, bro, because you wanna go back to fuckin' jail. Do you wanna continue living the life that you live? Do you just wanna finish your time by yourself with nobody fucking bothering you? Cuz I can fuckin' easy forget about you, bro. Or we can see each other daily."

Sept. 11 Tr. at 33:3-6.

82. Trujillo asked Salazar: "How much do you owe the Mexicans for that dope. Cuz we can help you pay for that, if you need, so they won't come after your family."[7] Recording at 27:10-17; Sept. 11 Tr. at 33:7-8 (Trujillo); id. at 33:10-11 (Trujillo). See Motion ¶¶ 30-31, at 7.

83. Madrid then emphasized to Salazar that she and Trujillo could pay for his debt "like that," and snapped to emphasize how easily it could be done. Sept. 11 Tr. at 33:9 (Madrid). See Recording at 27:19-27:52.

84. Trujillo continued: "We could get the money and fuckin' help you pay for that fuckin' dope that you owe the Mexicans. How much do you owe 'em?" Sept. 11 Tr. at 33:10-11 (Trujillo). See Recording at 27:19-27:52.

85. When Salazar responded "[a] lot," Sept. 11 Tr. at 33:12 (Salazar), Madrid said "[t]hat's a fuckin' lot bro. That ain't our fuckin' first rodeo," Sept. 11 Tr. at 33:13 (Madrid), and Trujillo told him, "[w]e can clear your name, Leon.[8] We just need to know facts about how much

---

[7]The Sept. 11 Tr. states that Trujillo told Salazar, "So they won't come after (unintelligible)." Sept. 11 Tr. at 33:8. After reviewing the Recording, the Court agrees with Salazar that Trujillo said "so they won't come after your family." Recording at 27:25. See Motion at 18.

[8]According to the Sept. 11 Tr., Trujillo stated that "You can clear your name, Leon." Sept. 11 Tr. at 33:14. Salazar claims in the Motion that Trujillo stated "We can clear your name, Leon."

you owe 'em and stuff," Sept. 11 Tr. at 33:14-15 (Trujillo).

86.    Salazar said he was hesitant to cooperate with Madrid and Trujillo because of his past experience with another law enforcement officer.  See Sept. 11 Tr. at 33:16-34:14 (Salazar, Madrid).

87.    Salazar asked Madrid and Trujillo: "So what do you want me to do?"  Sept. 11 Tr. at 34:15.

88.    Madrid asked in reply, "[h]ow much do you owe the Mexicans so we can help you pay 'em, first off," and Trujillo then asked for "names, what they drive, where they live, where you meet 'em, in Burque, in El Paso, in Colorado.  You know, a lot of details."  Sept. 11 Tr. at 34:16-18 (Madrid, Trujillo).

89.    Trujillo later stated: "You know, if you're gonna be a man, I'd rather you just say, "Fuck you guys," and get the fuck outta here, man.  But if you say somethin', be a man about it and tell the truth.  You get what I'm sayin'?"  Recording at 29:18-27; Sept. 11 Tr. at 35:3-5 (Trujillo).

90.    Trujillo then said: "So we can help your family be safe, your kids the most of all.  You know?  You're already an adult.  You know, you and your wife.  But your kids most all need the safety of clearing that debt that you owe 'em cuz I know that wasn't cheap.  Right?  So start off by telling me how much you paid for it, how much you owe 'em, who you get it from, what's their name, brother, all that bullshit."  Sept. 11 Tr. at 35:7-11 (Trujillo).

91.    Salazar stated that he owed a man in Mexico $23,000.00.  See Recording at 29:51-

---

Motion at 18.  Trujillo testified at the hearing that he believed that he said "We can clear your name, Leon."  Tr. at 93:19-21 (Trujillo, Houghton).  See Recording at 27:45.

30:01; Sept. 11 Tr. at 35:12-19 (Salazar, Trujillo). <u>See</u> <u>also</u> Madrid Report at 6.

92.      Salazar said he went to a blue trailer to pick up heroin, that a male brought it out to him hidden under the male's shirt, and that Salazar and his girlfriend took Salazar's car and left it there along with the key to the vehicle as collateral. <u>See</u> Madrid Report at 6.

93.      Trujillo requested that Salazar go on a "cruise" with Trujillo and Madrid, and that Salazar show the two officers where the man Salazar owed money lived. Recording at 30:33-37. <u>See</u> Sept. 11 Tr. at 36:3-4 (Trujillo)("Do you know where he lives? Can you take, can we go for a cruise and you can show us, point it out for us?").

94.      Salazar whispered that his girlfriend was with him, and that he did not want her or anybody else to know. <u>See</u> Recording at 30:38-46; Sept. 11 Tr. at 36:7 (Salazar)("I don't want her to know. I don't want anybody to know.")

95.      Salazar stated that he did not know the name of the man to whom he owed money, but simply knew him as Jesús' brother. <u>See</u> Recording at 30:56-31:11; Sept. 11 Tr. at 36:11-18 (Salazar, Trujillo, Madrid). <u>See</u> <u>also</u> Madrid Report at 6.

96.      To encourage Salazar to keep telling the truth, Trujillo said: "And when we bust this fuckin' mojao,[9] guess where he's goin'? To Mexico and he's outta your fuckin' hair. Cuz ICE will be, you work well with ICE and he's fuckin' gone. That's another thing that you won't have to worry about is he's fuckin' gone and he won't even know where the fuck it came from. Because once you point out his chante, and we go and fuckin' hit him like two, three days later,

---

[9]"Mojao" is a slang term for "wetback," a derogatory slur, and it refers to "[s]omeone who just got to the states." Mojao, *Urban Dictionary*, https://www.urbandictionary.com/define.php?term=mojao (last accessed December 18, 2019). <u>See</u> Sept. 11 Tr. at 37:12 (Trujillo).

he won't even know where the fuck it came from."  Sept. 11 Tr. at 37:12-17.

97.     Salazar then asked: "What's gonna happen to me?"  Sept. 11 Tr. at 37:18 (Salazar).

98.     Madrid and Trujillo responded with promises of leniency, saying "I told you, bro, if your shit pans out, I fuckin' don't even know you," and "Clear?  You fuckin' just come and do a piss test like you normally do, you're good to go.  Just like normal.  But you will help out the fucking community of Española Valley by doing this truthfully."  Sept. 11 Tr. at 37:19-22 (Madrid, Trujillo).

99.     Salazar then described the man's location to Trujillo and Madrid, and stated that Salazar met the man through one of his friends.  See Recording at 32:21-33:20; Sept. 11 Tr. at 38:1-40:1 (Salazar, Trujillo).

100.    Salazar stated that he believed the heroin he got from the man was pretty clean and that he would sell three grams for $180.00.  See Recording at 33:26-34:04; Sept. 11 Tr. at 40:7-41:4 (Trujillo, Salazar Madrid).

101.    Salazar said that his car was with his dealer as collateral for the heroin.  See Sept. 11 Tr. at 43:4-7 (Madrid, Salazar).

102.    In response to a picture that Trujillo showed him, Salazar responded that the man whom Trujillo showed him was not the man to whom Salazar was referring and that the man of whom Salazar spoke was much younger than Salazar.  See Recording at 37:15-30; Sept. 11 Tr. at 44:1-11 (Trujillo, Salazar).

103.    Salazar said that the heroin came "from Mexico straight to his house" "and then to us."  Sept. 11 Tr. at 44:17-19.

104.    Trujillo told Salazar that he needed to take them to the man's house that same day, stating "[o]kay. You need to fuckin' take us there like . . . today.  I don't know how that

fuckin' . . . can get rid of your chick or what but this needs to happen today," and "[t]his needs to fuckin' happen today," which Madrid repeated: " . . . [T]his need [sic] to happen today." Recording at 37:44-38:01; Sept. 11 Tr. at 45:1-6 (Trujillo, Salazar, Madrid). <u>See</u> Motion ¶¶ 35-36, at 8.

105.    Salazar expressed concern that "they're gonna know it's me right away." Recording at 38:13-16; Sept. 11 Tr. at 45:9 (Salazar). <u>See</u> Madrid Report at 6.

106.    Madrid told Salazar: "[I]f you're as clean as you say you are, you're gonna fuckin' remember shit, okay?" Recording at 38:35-42; Sept. 11 Tr. at 46:8 (Madrid).

107.    Salazar continued to swear that he did not know the man's name, and eventually stated that he would take Trujillo and Madrid to the place. <u>See</u> Recording at 39:20-28; Sept. 11 Tr. at 47:9-11 (Salazar, Trujillo).

108.    Salazar provided a physical description of the man as skinny and between twenty-four and twenty-six years old. <u>See</u> Recording at 39:29-40:10; Sept. 11 Tr. at 47:15-48:18 (Trujillo, Salazar, Madrid). <u>See also</u> Madrid Report at 6.

109.    Salazar then described the man's house as a small, white trailer between two other rental trailers, right off the highway. <u>See</u> Recording at 40:12-40:32; Sept. 11 Tr. at 49:2-11 (Madrid, Salazar). <u>See also</u> Madrid Report at 6.

110.    Trujillo told Salazar to make up an excuse so that his girlfriend would leave. <u>See</u> Recording at 40:33-40:39; Sept. 11 Tr. at 49:12-13 (Trujillo). <u>See also</u> Motion ¶ 37, at 8.

111.    Salazar told the officers that his girlfriend was probably scared already and might already have left. <u>See</u> Recording at 40:42-48; Sept. 11 Tr. at 49:14-16 (Salazar).

112.    He told the officers that she did not know about his heroin dealing. <u>See</u> Sept. 11

Tr. at 43:11-12.

113.    Trujillo then said: "We need to take a cruise now.  Can you send your chick . . . ?"
Sept. 11 Tr. at 49:12.

114.    Madrid told Salazar that she had told other officers that "[t]his kid . . . he knows he
fucked up," and "he knows that his life is in danger" and so he would likely cooperate with any
investigation.  Sept. 11 Tr. at 50:14-16.

115.    Trujillo and Madrid began to brainstorm a plan to get Salazar out of the building
without his girlfriend noticing, and proposed sneaking him out the back, or having Vasquez tell
the girlfriend something to ease her suspicions.  See Recording at 41:26-51; Sept. 11 Tr. at 50:19-
51:13 (Trujillo, Salazar, Madrid).

116.    While Trujillo, Madrid, and Salazar were discussing how to get Salazar out of the
building, Trujillo opened the door to get Vasquez, and Madrid said, "close the door, bro, when you
leave, I'll open it."  Recording at 42:19-26 (Madrid).  See Sept. 11 Tr. at 52:7-8 (Madrid); Tr. at
39:19-40:2 (Houghton, Trujillo).

117.    Madrid asked Salazar when he got the drugs from his supplier, and Salazar
estimated that he got them one or two weeks before the interview and further said that he had not
sold any of the drugs.  See Recording at 42:48-43:02; Sept. 11 Tr. at 52:19-53:2 (Madrid, Salazar).
See also Madrid Report at 6.

118.    Salazar repeated that he did not get rid of anything.  See Recording at 43:12-17;
Sept. 11 Tr. at 53:5-6 (Madrid, Salazar).

119.    Trujillo, Madrid, and Salazar eventually settled on a plan wherein Salazar would
tell his girlfriend that he needed her to leave and go back to Salazar's residence to locate paperwork

needed by his probation officer.  <u>See</u> Recording at 43:37-44:23; Tr. at 39:5-10 (Trujillo); Sept. 11

Tr. at 53:11-19, 54:1-8.

120.    After implementing this plan, Trujillo, Madrid, and Salazar began to leave the

probation office so that Salazar could show Trujillo and Madrid the location of Salazar's drug

supplier.  <u>See</u> Motion ¶ 40, at 8; Response at 6.

121.    As Salazar was leaving the probation office to speak to his girlfriend, Madrid

informed him: "And I'm telling you right now, bro, there's, we're not the only two here.  So if you

run, they're gonna catch you.  Just so you know."  Recording at 44:42-47.  <u>See</u> Sept. 11 Tr. at

55:6-7 (Madrid).  <u>See</u> Motion ¶ 39, at 8.

122.    The interview at the probation office then concluded.  <u>See</u> Recording at 44:58; Sept.

11 Tr. at 55:12.

123.    The interview lasted approximately forty-five minutes.  <u>See</u> <u>generally</u> Recording

(recording entire interview's duration, which lasted forty-five minutes and five seconds).

124.    Salazar was not informed of his <u>Miranda</u>[10] rights at any point during the interview.

<u>See</u> Motion ¶ 41, at 9.

---

[10]<u>Miranda v. Arizona</u>, 384 U.S. 436, "requires that procedural safeguards be administered
to a criminal suspect prior to 'custodial interrogation.'"  <u>United States v. Perdue</u>, 8 F.3d 1455,
1463 (10th Cir. 1993)(quoting <u>Miranda v. Arizona</u>, 384 U.S. at 444).  The Supreme Court of the
United States of America provided the substance of the warning that must be given to a defendant
to meet these procedural safeguard requirements:

> Prior to any questioning, the person must be warned that he has a right to remain
> silent, that any statement he does make may be used as evidence against him, and
> that he has a right to the presence of an attorney, either retained or appointed. The
> defendant may waive effectuation of these rights, provided the waiver is made
> voluntarily, knowingly and intelligently. If, however, he indicates in any manner
> and at any stage of the process that he wishes to consult with an attorney before
> speaking there can be no questioning. Likewise, if the individual is alone and
> indicates in any manner that he does not wish to be interrogated, the police may not

125.     Salazar was not handcuffed and was free to leave the interview at any time through an unobstructed exit.  See Tr. at 64:14-17 (Trujillo).

126.     Salazar left the probation office with Trujillo and Madrid in their unmarked police vehicle.  See Tr. at 42:10-11 (Trujillo).

127.     Salazar entered the vehicle freely and sat in the front; he was not restrained in any capacity except by his seatbelt.  See Tr. at 42:12-17 (Trujillo, Houghton).

128.     Madrid sat in the vehicle's backseat, directly behind Salazar.  See Tr. at 42:21 (Trujillo).

129.     Neither Trujillo's gun nor Madrid's gun was visible to Salazar, nor were their handcuffs visible.  See Tr. at 42:24-43:8 (Houghton, Trujillo).

130.     Salazar then proceeded to drive around with Madrid and Trujillo, and to provide further statements and information regarding Salazar's drug dealer.  See Motion ¶ 40 at 8; Response at 6.

131.     Salazar pointed out an area of mobile homes on US Highway 84/285 and specifically pointed out a blue mobile home with wrought iron security features on the windows and doors.  See Madrid Report at 6.

132.     Salazar also pointed out a white Chevrolet pickup truck with chrome rims and his own white Lexus, positioned between the Chevrolet and a silver Toyota pickup truck.  See Madrid Report at 6.

---

question him.

Miranda v. Arizona, 384 U.S. at 444-45.

133. All three vehicles were parked under a manmade parking structure attached to the blue mobile home. See Madrid Report at 6.

134. Madrid and Trujillo took sixty-one photographs of the area Salazar pointed out. See Madrid Report at 7.

135. Trujillo and Madrid drove Salazar back to the probation office, and Salazar left. See Tr. at 44:24-45:5 (Trujillo, Houghton). See also Madrid Report at 7.

136. The officers told Salazar to communicate with Madrid as much as possible. See Tr. at 45:13-14 (Trujillo).

137. In the following days, Madrid attempted to call and text Salazar several times, but received no response. See Madrid Report at 7.

138. Madrid advised Vasquez of Salazar's lack of communication, and Vasquez indicated that he would contact Salazar. See Madrid Report at 7.

139. On September 14, 2018, Trujillo and Madrid met with Salazar at the probation office, after Vasquez summoned Salazar to the office on Trujillo's and Madrid's request. See Response at 6; Tr. at 110:12-17 (Ray, Madrid).

140. Neither Trujillo nor Madrid informed Salazar of his Miranda rights at the September 14, 2018, meeting. See Tr. at 101:20-25 (Ray, Madrid).

141. Salazar's second interview with Madrid and Trujillo lasted approximately thirty-seven minutes. See generally Gov't Exh. 2a, State Police Audio Recording of September 14, 2018, Interview of Leon Salazar at 00:00 to 36:24. ("Sept. 14 Recording")(admitted at March 4, 2019, hearing as United States hearing Ex. 2-A)(Recording entire duration of September 14, 2018, Interview of Leon Salazar, which lasted thirty-six minutes and twenty-four seconds).

142. During the second interview, Trujillo and Madrid asked Salazar a series of questions aiming to identify individuals who might have sold Salazar heroin. See Sept. 14 Recording at 00:00-04:34; Transcription of September 14, 2018 Interview of Leon Salazar at 1:1-4:13 (Madrid, Salazar, Trujillo), filed January 25, 2019 (Doc. 29)("Sept. 14 Tr.").

143. Salazar initially denied his involvement in any heroin dealing, telling Madrid and Trujillo that "[n]o, never, ever . . . I haven't dope since (unintelligible)." Sept. 14 Tr. at 4:14 (Salazar).

144. Madrid told Salazar that, when they were in the break room three days ago, Salazar admitted that the heroin that the officers found was his heroin. See Sept. 14 Recording at 05:12-19; Sept. 14 Tr. at 5:9-10 (Madrid).

145. Salazar responded: "What heroin? No, I didn't admit to no heroin. I haven't touched heroin [unintelligible]." Sept. 14 Recording at 05:20-24; Sept. 14 Tr. at 5:11 (Salazar).

146. Madrid indicated to Salazar that she had recorded their conversation in the break room. See Sept. 14 Recording at 05:50-54; Sept. 14 Tr. at 6:4 (Madrid).

147. Salazar continued to deny that he had admitted to any heroin, and Madrid insisted that he had, stating that he admitted that he "went and asked [his] neighbor for it, and [his] neighbor didn't have it." Sept. 14 Recording at 06:00-14; Sept. 14 Tr. at 6:8-16 (Salazar, Madrid).

148. Salazar reiterated that he did not know anything about the found heroin, but that he would help the officers in any way he could, because "[e]veryone talks so you pretty much know everything on everybody," and that he would stick to his word and help them however he could. Sept. 14 Recording at 06:28-07:47; Sept. 14 Tr. at 7:1-8:4 (Salazar, Trujillo, Madrid).

149. Salazar recounted a story of going to get heroin from a man who came out of a blue trailer with the heroin under his shirt, and Salazar clarified that he was referring to an event which

took place three years ago.  See Sept. 14 Recording at 16:00-18:16; Sept. 14 Tr. at 15:16-17:16 (Salazar, Trujillo, Madrid); id. at 17:2 ("I didn't get no heroin.").

150.     Salazar repeated that he went to his neighbor's house to ask about the lost purse of his other neighbor's daughter.  See Sept. 14 Recording at 20:59-21:25; Sept. 14 Tr. at 20:13-1:7 (Trujillo, Salazar, Madrid).

151.     About thirty minutes into the interview, Trujillo asked Salazar if it was correct that, two weeks prior, he picked up heroin from the men he had identified, and Salazar said yes.  See Sept. 14 Recording at 30:50-31:10; Sept. 14 Tr. at 29:8-10 (Trujillo, Salazar).

152.     Salazar stated that he did not know what day two weeks ago he picked up the heroin, that his girlfriend did not know that he had picked up heroin, that he went alone, and that he sat in his car outside the heroin supplier's house but did not enter the house.  See Sept. 14 Recording at 31:40-32:25; Sept. 14 Tr. at 30:7-31:8 (Trujillo, Salazar).

153.     Salazar said that the heroin supplier came outside and opened Salazar's trunk, that Salazar did not see what the supplier did, and that afterwards the two men shook hands but did not exchange money.  See Sept. 14 Recording at 32:30-32:46; Sept. 14 Tr. at 31:15-18 (Salazar, Trujillo).

154.     Salazar recounted that he then drove to his house, where he broke the heroin in half and planned to further break it up into sandwich bag portions.  See Sept. 14 Recording at 32:50-33:49; Sept. 14 Tr. at 32:1-18 (Madrid, Salazar, Trujillo).

155.     Salazar stated that, after he broke the heroin in half, he put it in his bedroom, on the side of his bed.  See Sept. 14 Recording at 34:38-50; Sept. 14 Tr. at 33:13-34:3 (Madrid, Salazar, Trujillo).

156.    Madrid and Trujillo spoke with Drug Enforcement Administration ("DEA") Agent Christopher Scott Godier on the telephone, and provided him with the details of both interviews, after which Godier indicated that he would speak to the Assistant United States Attorney to get further direction on the case and possibly to apply for a search warrant.  See Madrid Report at 7.

157.    On September 17, 2018, Godier, relying on information which Trujillo and Madrid provided him, obtained a search warrant for Manuel Ramos-Castillo's residence.  See Motion ¶ 44, at 9.

158.    On or around October 24, 2018, the United States obtained a search warrant for Salazar's electronic devices, relying in part on Salazar's statements.  See Motion ¶ 45, at 9.

159.    Salazar was arrested when he became a suspect in a shooting and Rio Arriba County sheriffs received a report that Salazar brandished a handgun.  See Tr. at 56:6-57:18 (Trujillo, Houghton).

160.    Salazar has been arrested several times, and he has served one year in prison.  See Salazar's Criminal History at 1-3 (admitted at March 4, 2019, hearing as United States Ex. 5).

161.    Salazar has, in the context of previous charges and cases, been advised of his Miranda rights, and, on at least one previous occasion, Salazar has invoked his right to have an attorney present after receiving Miranda warnings.  See Tr. at 52:12-52:16 (Houghton, Trujillo).

162.    In Salazar's Order of Probation, he agrees that he "will follow all orders and instructions of [his] Probation/Parole Officer."  See Gov't Ex. 4, Order of Probation, at 1 (admitted at March 4, 2019 hearing as United States hearing Ex. 4).

## PROCEDURAL BACKGROUND

Salazar filed the Motion, arguing that, pursuant to the Fifth Amendment to the Constitution of the United States and rule 12(b)(3)(C) of the Federal Rules of Criminal Procedure, the Court

should suppress and forbid introduction into evidence of Salazar's September 11, 2018, statements to Trujillo and Madrid, as well as all evidence in the form of either statements or tangible evidence, subsequently obtained as a result of the September 11, 2018, questioning.  See Motion at 1.  The United States responds, asking the Court to deny the Motion, arguing that Salazar waived his Fifth Amendment rights under his probation terms, that the September 11, 2018, encounter was consensual, and that Salazar's September 11, 2018, statements were freely and voluntarily made. See Response at 1.  Salazar replies and, in the Reply, addresses new discovery filed after the Motion, "including a recording of a second interrogation," which Salazar argues is "tainted by unconstitutional police misconduct."  Defendant's Reply Supporting His Opposed Sealed Motion to Suppress Evidence, filed January 14, 2018 (Doc. 28)("Reply").

**1.    The Motion.**

Salazar begins the Motion by contending that the Court should suppress his September 11, 2018, statements and evidence derived therefrom, because he was "aggressively questioned in a custodial setting without *Miranda* warnings."  Motion at 1.  Salazar argues that Trujillo and Madrid "violated his due process rights by using coercion, intimidation, fear, and false or illusory promises or inducements to obtain statements."  Motion at 1.  Salazar contends that the United States can identify nothing to purge the taint of the officers' constitutional violations, so the Court should suppress all of Salazar's statements and evidence obtained as a result of those statements.  See Motion at 1-2.

Salazar notes several environmental attributes in support of his argument that the September 11, 2018, interview took place in a custodial setting.  See Motion at 14-15.  Salazar notes that his probation terms required him to report to Vasquez at the Española Probation Office or else risk the issuance of a bench warrant.  See Motion at 14.  Salazar notes that the State of New

Mexico Corrections Department operates the Española Probation Office and that, as the Española Probation Office's signage indicates, the general public may not enter and move freely beyond the secured front waiting area. See Motion at 14. Salazar notes that Vasquez, upon receiving Salazar, "ordered him: 'You need to come this way.'" Motion at 14. Salazar contends that Vasquez escorted him to a small, windowless room with only one exit, "not to the outside," which was isolated from public access. Motion at 14, 16. Salazar avers that Madrid and Trujillo, who "identified themselves as state police, displayed their badges, and were clearly armed," Motion at 16, and were already in the room, Motion at 14, 16. Salazar contends that Vasquez directed him to wait in the lobby after the officers concluded their interview of him, that, when Vasquez left the room, he closed the door behind him, and that one of the officers then locked the door. See Motion at 14-15.

Salazar contends that, not only was the environment custodial, but also that the interview was a custodial interrogation. See Motion at 14-16. Salazar argues that Trujillo's and Madrid's questions "were direct and were bolstered with high-pressure tactics designed to create the impression that Mr. Salazar had no choice but to confess." Motion at 15. Salazar cites to United States v. Romero, 734 F. Supp. 2d 1281 (D.N.M. 2010)(Browning, J.), for the principle that "'[a]ny questioning by law-enforcement officers "reasonably likely to elicit an incriminating response" constitutes an interrogation.'" Motion at 15 (quoting United States v. Romero, 734 F. Supp. 2d at 1310 (quoting Rhode Island v. Innis, 446 U.S. 291, 301 (1980))). Salazar contends that Trujillo's and Madrid's questioning meets that standard, because their questioning was "aimed at getting Mr. Salazar to admit to ownership of the package and to provide other information about its origins." Motion at 15. Salazar points to Madrid's indications during the interview that Salazar's DNA would show up on the package and that surveillance cameras may have captured

Salazar looking for the package, as questions designed to "create the impression that Mr. Salazar had no choice but to confess." Motion at 15. Salazar argues:

> No reasonable person, in a Correctional Department facility for a mandatory probation visit, ordered into a small room with two State Police officers, commanded by the officers to sit, interrogated for nearly an hour by these two aggressive State Police Officers, commanded to participate in another hour-long ride along, and warned "if you run they're going to catch you," would feel free to leave.

Motion at 16 (quoting Recording at 44:42-47; Sept. 11 Tr. at 55:6-7 (Madrid)). Salazar argues that the car interview "furthered the custodial nature of the encounter," because Salazar's participation was involuntary where officers told him the car interview had to happen that day and warned him that if he ran away he would be caught. See Motion at 16.

Salazar further contends that his statements on September 11, 2018, were involuntary, because they were obtained through tactics in violation of due process, or by compulsion or inducement. See Motion at 17 (citing Griffin v. Strong, 983 F.2d 1540, 1542 (10th Cir. 1993)). Salazar argues that the officers used the following "compulsory means" to extract his statements:

> (i) they threatened to "tax" Mr. Salazar and his girlfriend if he did not provide information; (ii) they told him that they would find out that he owned the drug package regardless; (iii) they promised him leniency multiple times in exchange for information; they implied that his failure to cooperate would result in the murder, including decapitation, of his children; (iv) they commanded him to take them to the location of his supplier and told him if he tried to run he would be caught; and (v) they promised to obtain money to pay his drug debt if he cooperated.

Motion at 17. Salazar argues that he was scared or crying for most of the interview, that the officers discussed the possible decapitation of his children and the possibility of Salazar going to prison for life, and that the officers' threatened to go after both Salazar and his girlfriend if he did not provide the necessary information. See Motion at 17.

Salazar argues that the September 14, 2018, statements and the search warrants that the

United States obtained relying at least in part on Salazar's September 11, 2018, statements, should be excluded as fruit of the poisonous tree. <u>See</u> Motion at 19. Salazar argues that the violations that compel the statements' and evidence's exclusion are not procedural <u>Miranda</u> violations but are "unambiguously constitutional in nature, implicating both due process and the right against self-incrimination." <u>See</u> Motion at 19. Salazar also argues that the Supreme Court of the United States of America has expressed some doubt whether the fruit-of-the-poisonous-tree exclusion should apply in situations where procedural <u>Miranda</u> violations have taken place. <u>See</u> Motion at 19-20. Nevertheless, Salazar contends that the Court must exclude the statements and evidence at issue to properly vindicate Salazar's constitutional due process rights and to deter constitutional violations. <u>See</u> Motion at 21.

        2.        **<u>The Response</u>**.

The United States characterizes the September 11, 2018, interview's environment as noncustodial. <u>See</u> Response at 2-3. The United States contends that the Española Probation Office is located in a commercial plaza, has no attached jail, and is 1.6 miles away from the nearest police office. <u>See</u> Response at 2-3. The United States contends Trujillo and Madrid were in plain clothes and unarmed, and that they chose to conduct the interview in the break room "to prevent other probationers from seeing Salazar talking to them for his own safety," as they were hoping Salazar would help them to identify a drug trafficker in the area. Response at 3. The United States further contends that their safety concerns appear justified, because Salazar filed his Motion under seal for his own safety. <u>See</u> Response at 3 n.2. Regarding Vasquez' instruction to Salazar to wait in the lobby after the interview, the United States argues that Vasquez' statement indicated to Salazar that the officers were not there to arrest him. <u>See</u> Response at 3. The United States contends that the break room's door remained unlocked during the interview, and that Salazar sat in the chair

nearest the door and close to one of two windows.  See Response at 3-4.  The United States argues that the room's features, which include a microwave, refrigerator, television, and water cooler, indicate that the room "is clearly not a law enforcement interrogation room."  Response at 4.

The United States avers that Trujillo's and Madrid's encounter with Salazar was consensual, that Salazar verbally assented to answer questions, and that he was not handcuffed or restrained in any way.  See Motion at 4.  The United States notes that the recording evinces that the officers "do not raise their voices, do not disparage the Defendant or call him names, and are focused on identifying a major supplier of heroin into the Española Valley."  Response at 4 n.5.  The United States notes that, at one point during the interview, Salazar refers to Trujillo as "dude."  Response at 5.  Furthermore, the United States contends that Salazar expressed strong emotion only when he told the officers "that he lost custody of his children and wants them back," and that he cried at no other point during the interview.  Motion at 5.  The United States counters Salazar's contention that the officers subjected him to a two-hour custodial interrogation by averring that the interrogation in the break room lasted only forty-five minutes and that the remainder of the officers' interaction with Salazar took place in the officers' vehicle.  Response at 5.

The United States argues that Salazar began to "make admissions to the agents only twenty-two and a half minutes into the interview," and the United States contends that Salazar admitted that the heroin belonged to him and that he owed $23,000.00 for it.  Response at 5.  The United States contends that, although the officers had probable cause to arrest Salazar at this point, they "continued only to solicit information about his supplier and uphold their assurances" that they were not interested in Salazar himself.  Response at 5-6.  The United States argues that Salazar voluntarily identified the location of his heroin supplier's trailer, and voluntarily described the supplier, later identified as Manuel Ramos-Castillo.  See Response at 6.  The United States

contends that, despite Salazar's detailed admissions, the officers did not arrest Salazar and instead returned him to the Probation Office for his regularly scheduled meeting with Vasquez. See Response at 6.

The United States avers that, at the September 14, 2018, meeting, Salazar positively identified photographs of Jesús and M. Ramos-Castillo, and again freely left at the interview's end. See Response at 6-7. The United States notes that, on September 17, 2018, the Honorable Laura J. Fashing, United States Magistrate Judge for the United States District Court for the District of New Mexico, signed a search warrant for M. Ramos-Castillo's residence, and that, on September 24, 2018, Albuquerque DEA agents and Task Force agents executed the search warrant. Response at 7. "During the execution of the warrant, agents located over 1 kilogram of heroin, $17,180.00 United States currency, two firearms, drug packaging materials, digital scales, and notebooks containing drug ledgers in the residence." Response at 7. The United States contends that, after his arrest, agents administered Miranda warnings to M. Ramos-Castillo, and that, after receiving the Miranda advisements, M. Ramos-Castillo "confessed to trafficking multiple kilograms of heroin into Northern New Mexico." Response at 7.

The United States also avers that, "[o]n October 3, 2018, law enforcement received information that Salazar shot into an Española-area trailer with an AK-47," and that, in the course of that shooting, one of the trailer's occupants was struck by a bullet and sustained non-life-threatening injuries. Response at 7. The United States contends that law enforcement also received information that, days before the shooting, Salazar threatened the trailer's occupants and accused them of being "rats." Response at 7. The United States contends that it directed the DEA to arrest Salazar "on a criminal complaint charging the possession of the 646 grams of heroin turned in by Salazar's neighbor" to mitigate the risk to the community. Response at 7. The United

States avers that, after his arrest, Salazar admitted that he argued with the trailer's residents days before the shooting, but denied waving a handgun, and that he admitted that he previously owned an AK-47, but denied that he still owns it. Response at 7.

The United States disagrees with Salazar that the September 11, 2018, interview constitutes a custodial interrogation, but advises that, even if it was, the Court should find that Salazar forfeited his Fifth Amendment rights under his state probation's terms. See Response at 8. The United States contends that Salazar's actions showing up "for his regularly scheduled appointment and to follow the instructions of his PO to talk to Agents Madrid and Trujillo" were "simply complying with the conditions of his probation order." Response at 8. Regarding the interview's location, although not a dispositive factor, the United States avers that Salazar was "very familiar with the probation office," that it was located "in a commercial and retail area," and that it was "not in close proximity to any other law enforcement offices or police department." Response at 13.

Although the United States acknowledges that Salazar did not have prior notice of the interview, the United States contends that, more importantly, Trujillo and Madrid repeatedly assured Salazar that they were not interested in arresting him, and that the interview took place in an unlocked room with windows. See Response at 13. The United States also notes that Salazar's statements were voluntary and were not made during the course of a custodial interrogation, but in an interview where: (i) Salazar was unrestrained; (ii) Trujillo and Madrid were in plain clothes, unarmed, and spoke at a normal volume; (iii) the door was unlocked, and Salazar sat closest to it; (iv) Salazar was familiar with the location; (v) the location was not connected to a law enforcement building; (vi) Salazar moved around the room freely; (vii) Salazar confessed after only a half hour; and (viii) the one arguably custodial statement, "if you run they're going to catch you," was made at the end of the interview, after Salazar's confession to possession. Response at 13, 19-20. The

United States argues that, if Salazar "was free to leave after confessing to possession of 646 grams of heroin, it is untenable to argue that he was in custody prior to his confession." Response at 14.

Regarding the voluntariness of Salazar's statements, the United States contends that they were voluntary, because the agents did not threaten him, although they used strong language. See Response at 16. The United States argues that "[p]olice frequently create pressure when interviewing individuals about criminal conduct, but the threshold for using so much pressure that a statement becomes involuntary is high." Response at 16 (citing United States v. Johnson, 351 F.3d 254 (6th Cir. 2003)). The United States further argues that the officers' promises of leniency are not false and that they were initially kept when the United States released Salazar without arrest following his confession to possession. See Response at 16. The United States argues that only after Salazar was implicated in a shooting did law enforcement seek to arrest him for the heroin "and neutralize him as a threat." Response at 16. The United States avers that the officers' allegations regarding Salazar's DNA potentially being on the package were "fully within the bounds of a constitutional confession and do not render admissions involuntary." Response at 17. Additionally, the United States argues that references to potential consequences which Salazar might face, such as harm to his children, are not unconstitutional. See Response at 17. In sum, the United States contends that the officers' conduct was not egregious enough for Salazar's statements to be deemed involuntary. See Response at 18.

The United States also urges the Court to consider Salazar's lengthy criminal history in determining his confession's voluntariness. See Response at 19. The United States argues that, by virtue of his long criminal history, Salazar "has an extensive history of interacting with law enforcement officers and probation officers. Accordingly, he has a high capacity to resist any pressure they may exert during an interview." Response at 19. The United States contends that

Salazar does not sound stressed or nervous, suggesting that he was not under tremendous pressure during the interview.  See Response at 19.

### 3. **The Reply.**

Salazar begins by stating that "[t]here is not much profit in the parties having a battle of characterizations regarding contacts which were recorded and are available for the Court to review for itself."  Reply at 1.  Salazar contends, however, that a reasonable listener would conclude that Salazar was "not a coequal participant in a mere conversation" and that the alleged conversation began with "a display of authority."  Reply at 1.  Salazar argues that, as applicable law defines the term "interrogation," Trujillo and Madrid interrogated Salazar, because they engaged in direct questioning "'reasonably likely to elicit an incriminating response from the suspect.'"  Reply at 2 (quoting United States v. Briggs, 273 F.3d 737, 740 (7th Cir. 2001)).  Salazar contends that the United States' contention that the officers were not interested in Salazar and only sought information about his supplier is untenable where they questioned him often without reference to his alleged supplier, and where "requests for information about a suspected narcotics dealer's supplier inherently request[] inculpatory information."  Reply at 3.

Salazar contends that, despite the parties' dueling characterizations, it is undisputed that, without once receiving Miranda warnings, Salazar was asked to sit in the breakroom with Trujillo and Madrid, that the door was closed, that the office was a New Mexico Corrections Department facility, that the interview took place in a non-public area, and that officers asked him direct questions about a supposed lost drug package.  See Reply at 3.  Salazar notes that the officers "did not once tell him he was free to leave or to decline to answer questions."  Reply at 3.  Salazar contends that, considering the totality of the circumstances, any reasonable person would have felt that "he was in custody and would not be free to leave or to refuse to answer questions."  Reply at

4.

Salazar addresses the non-exhaustive list of factors which the United States Court of Appeals for the Tenth Circuit used in United States v. Jones, 523 F.3d 1235 (10th Cir. 2008), to determine custody for the purposes of triggering Miranda protections and which the United States cites in its Response. See Reply at 4. First, regarding the "extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will," Response at 11, Salazar contends that it is undisputed that neither Trujillo nor Madrid ever told Salazar "anything about being free to refuse to answer questions or to end the interview," Reply at 4. Second, regarding the questioning's nature, Salazar contends that the recording leaves no doubt that, from the interview's beginning, Trujillo and Madrid "unambiguously communicated that they were" Task Force Members, "that they believed Mr. Salazar was guilty of narcotics trafficking, that he would be inculpated regardless of whether he spoke to them," and that Trujillo and Madrid "themselves were effective, experienced officers," Reply at 5. Salazar also contends that Trujillo and Madrid "questioned Mr. Salazar for an extended period, using a profanity-laced approach." Reply at 5. Third, regarding "whether the police dominate the encounter," Response at 11, Salazar avers that the officers' tone and their words indicated their authority and dominant position relative to Salazar, see Reply at 5. Fourth, regarding "separation of the suspect from family or colleagues who could offer moral support," Response at 11, Salazar states that he was separated from his girlfriend and his probation officer, and that Trujillo and Madrid urged him to get rid of his girlfriend so that he could leave with them alone, isolating him, see Reply at 5. Fifth, regarding "isolation in non-public questioning rooms," Response at 11, Salazar states that the break room is a non-public area, see Reply at 6. Sixth, regarding the "threatening presence of several officers," Response at 11, Salazar argues that the officers outnumbered him, and that

Trujillo and Madrid referenced other officers who would catch Salazar if he ran away, see Reply at 6. Regarding the sixth and seventh factors, Salazar admits the officers did not brandish their weapons, and did not use physical contact or force during the interrogation. See Reply at 6. Eighth, regarding an "officer's use of language or tone of voice in a manner implying that compliance with the request might be compelled," Response at 11, Salazar notes that the parties present competing characterizations of the officers' tone and language use, and that the Court can determine both from the recordings.

Salazar replies to the United States' assertion that Salazar does not cite his own utterances in the Motion. See Reply at 7. Salazar contends that what he said is "largely irrelevant, except to the extent it reveals his fear and discomfort with the situation." Reply at 7. Salazar contends that, instead, the Court should examine the totality of the circumstances to determine the situation's custodial nature. See Reply at 7. Regarding the United States' citations to cases outside of the Tenth Circuit, Salazar contends those cases are inapposite, because of their factual differences, and should not guide the Court in determining Salazar's interview's custodial nature. See Reply at 7-9. Salazar contends that the United States' cited cases, although they may demonstrate that a scheduled probation interview does not have the indicia of custody, do not account for the fact that Salazar did not undergo a probation interview, "but rather a surprise interrogation at the Probation Office by two law enforcement officers." Reply at 9-10. Salazar contends, further, that the fact that he was allowed to leave after the interview does not bear on the interview's custodial nature, because he was not, in Salazar's estimation, able to leave before the officers released him. See Reply at 10.

Regarding the United States' contention that Salazar waived his Fifth Amendment rights by assenting to his probation terms, Salazar argues that nothing in his probation terms constitutes

a waiver of his Fifth Amendment rights.  See Reply at 10-11.  Salazar avers that waivers of constitutional rights must be knowing and voluntary, that State Police and not a Probation Officer conducted Salazar's interrogations, and that his probation terms' requirements that he communicate with his Parole Officer truthfully and accurately do not translate into a right of any party to compel statements from him or to require his self-incrimination.  See Reply at 11.

Salazar further argues that the construction of his probation terms is a matter of State of New Mexico law, because the terms relate to a state court sentence for a state law violation.  See Reply at 11-12.  Salazar avers that the United States does not cite any New Mexico cases suggesting that probation terms may amount to complete waivers of constitutional rights and that no New Mexico court has endorsed that idea.  See Reply at 12.  Salazar contends that he "could locate no authority in Federal or in New Mexico courts allowing for the abrogation of Fifth Amendment rights pursuant to a term of probation," in contrast to Fourth Amendment-related situations, in which probationers enjoy reduced privacy expectations.  Reply at 13.

Salazar argues that none of the statements that he made were voluntary and that the violations that occurred during the first interview tainted statements made subsequent to his September 11, 2018, interview.  See Reply at 14.  Salazar acknowledges that the United States references several permissible interrogation techniques but contends that "officers invoking images of decapitated children and then offering to pay money and provide protection in exchange for statements" is not a legitimate law enforcement technique.  Reply at 14-15.  Salazar avers that the United States downplays the extent to which leniency promises undermine a confession's voluntariness, but that Supreme Court and Tenth Circuit precedent dictate that leniency promises, especially when they are concrete, are relevant to determining a confession's voluntariness.  See Reply at 15 (citing United States v. Lopez, 437 F.3d 1059, 1065 (10th Cir. 2006)).  Salazar also

contends that the United States' assertion that, a few weeks after the interviews, Salazar fired shots and waved a firearm at a group of individuals has no basis on whether Salazar's rights were violated at the time the statements were made.  See Reply at 17.

> **4.    The Hearing.**

The Court held a hearing on the Motion on March 4, 2019.  See Tr. at 1.  The United States called Trujillo as its first witness at the suppression hearing.  See Tr. at 5:7-8 (Houghton).  Salazar called Madrid as his first witness, see Tr. at 95:7-8 (Ray), and Vasquez as his second witness, see Tr. at 115:24-25 (Ray).  After witnesses were called, Salazar and the United States presented closing arguments on the motion.

Salazar conceded that the testimony at the hearing clarifies that the agents were unarmed and in civilian clothing.  See Tr. at 137:16-21 (Ray).  Salazar argued that the September 11, 2018, interview's circumstances suggest that it was an interrogation designed to get Salazar to inculpate himself, and that caselaw supports treating similar situations as custodial interrogations requiring Miranda warnings.  See Tr. at 137:22-138:23 (Ray).  Salazar stated that "it's going to be up to the Court to decide if under the totality of the circumstances what we've shown is that it was custodial."  Tr. at 138:23-139:1 (Ray).

The Court asked whether the United States was correct that, because Salazar was on probation, there was nothing custodial about the interrogation.  See Tr. at 139:2-4 (Court).  Salazar responded that the fact that he was on probation indicates that he was not at the office of his own free will.  See Tr. at 139:5-7 (Ray).  The Court replied that Salazar traded some of his freedoms for the chance to spend his time outside of prison and that there is caselaw in support of the assertion that Salazar is not in custody simply because he is complying with his probation terms. See Tr. at 139:8-14 (Court).  Salazar argued that his probation alone is not dispositive, but that the

totality of circumstances indicate that Salazar was not free to leave the interrogation.  <u>See</u> Tr. at 139:15-22 (Ray).

The Court asked whether there is a separate doctrine at which to look when a suspect is on probation or whether the fact of his or her probation status is a factor to consider alongside other factors.  <u>See</u> Tr. at 139:23-140:3 (Court).  Salazar argued that there is no separate doctrine, because that would suggest "that probationers can never assert a Miranda violation because they're never in custody when they're showing up for probation being questioned" and that not "a single case" states that principle.  Tr. at 140:4-16 (Ray).  The Court posited that, when individuals come to the federal courthouse to meet their probation officers, everyone can agree that they are not in custody. <u>See</u> Tr. at 140:17-21 (Court).  Salazar stated that if someone reports to his or her probation officer, he or she is not necessarily in custody; but if a set of United States Marshals meets that person and says "[c]ome into this little room and talk to us," then the situation could become custodial, depending on the totality of the circumstances.  Tr. at 140:22-141:3 (Ray).  The Court inquired about a situation where a probation officer notices a police report about a probationer on supervised release, and some law enforcement agents meet the probationer before a regularly scheduled meeting and ask to talk about a suspected violation.  <u>See</u> Tr. at 141:4-14 (Court).  The Court asked whether, in that situation, the probationer is in custody.  <u>See</u> Tr. at 141:13-14 (Court).  Salazar replied that it depends on the totality of the circumstances.  <u>See</u> Tr. at 141:15-20 (Ray).  Salazar argued that the September 11, 2018, interview became custodial, because the officers directly questioned Salazar for a long period of time, using inducements and implying the existence of inculpatory evidence, to extract admissions from Salazar.  <u>See</u> Tr. at 141:21-142:10 (Ray).  The Court asked whether it is important that Trujillo and Madrid were not interested in Salazar, but in his supplier.  <u>See</u> Tr. at 142:11-15 (Court).  Salazar replied that the Recording reveals that the

officers intended to obtain information regarding Salazar's own involvement and not a supplier's involvement. See Tr. at 142:16-24 (Ray). The Court asked: "[I]sn't that just the way any police officer talks to somebody that they're trying to get to cooperate[?]" See Tr. at 144:11:13 (Court). Salazar disagreed with the Court, and the Court asked "what is different between this scenario or this circumstance[?]" Tr. at 144:16-20 (Court). Salazar responded that the officers did not tell him that he could leave, and that he was told that if he ran, other officers would catch him. See Tr. at 144:21-145:1 (Ray). The Court asked whether any of the statements that Salazar seeks to suppress occurred after the statement about what would happen if Salazar ran, and Salazar responded that he did not think there were any such statements. See Tr. at 145:5-9 (Court, Ray). The Court stated that, in a questioning, the tone can change, but that, until the statement about Salazar running, the interaction was a typical meeting between a police and a potential cooperator. See Tr. at 145:18-146:1 (Court). Salazar disagreed with the Court, citing the officers' tone and the interrogation's circumstances. See Tr. at 148:14-25 (Ray).

Salazar next argued that, even if the Court were to find the environment non-custodial, there is still a due process violation with which to contend. See Tr. at 149:1-5 (Ray). Salazar argued that, in violation of his due process rights, the officers extracted his confession "pursuant to illusory promises or intimidation or threats," rendering his statements involuntary and therefore "not admissible against the defendant at trial . . . ." Tr. at 149:6-10 (Ray). Salazar contended that the officers employed coercion, intimidation, and inducements, threatening Salazar's children and offering to pay his drug debts. See Tr. at 149:12-152:6 (Ray). Salazar contended that he made no admissions before the officers employed these tactics. See Tr. at 151:4-5 (Ray).

Salazar contended that, even if the officers did not intend to arrest Salazar after the interview, their subjective intent is irrelevant to the voluntariness inquiry, which depends on an

objective analysis of the officer's statements.  See Tr. at 153:22-154:4 (Ray).  The Court suggested that it appeared less coercive for the officers to tell Salazar that they would not send him to prison than to tell him "we're going to arrest you here in a moment -- did you do this crime?"  Tr. at 154:5-13 (Court).  Salazar agreed with the Court but argued that the officers told Salazar multiple times that he would go to jail for his alleged crimes.  See Tr. at 154:14-19 (Ray).

The United States began by outlining that there are two issues before the Court: (i) whether the September 11, 2018, interview was a custodial interview; and (ii) whether the statements Salazar made at that interview were voluntary.  See Tr. at 158:5-8 (Houghton).  Regarding the first issue, the United States argued that the interview was noncustodial, because the officers were in plain clothes and were unarmed, and spoke to Salazar for about forty-five minutes in an unlocked room with windows in a non-jail setting while Salazar was unrestrained.  See Tr. at 158:9-159:19 (Houghton).  The United States argued that there is a different doctrine when determining whether an interview of a probationer is custodial.  See Tr. at 160:6-19 (Houghton).  The United States contended that, similar to how probationers waive rights under the Fourth Amendment to the Constitution of the United States by way of probation terms requiring them to agree to warrantless searches of their persons, homes, and vehicles, probationers also waive their Fifth Amendment right against being compelled to give incriminating statements.  See Tr. at 160:23-162:10 (Houghton, Court).  The Court stated that it did not see a citation to a case supporting this proposition, especially where the probationer is not speaking to his probation officer but is instead speaking to two police officers about an unrelated crime.  See Tr. at 162:17-163:1 (Court).  The United States responded that there is a United States Court of Appeals for the Seventh Circuit case on point, but the Court responded that, in the Seventh Circuit case, the probation officer was in the interview along with the police officer, so that the meeting was at least partly probation-related.

See Tr. at 163:2-163:14 (Houghton, Court)(citing United States v. Cranley, 350 F.3d 616 (7th Cir. 2003)). The United States asserted that, in United States v. Cranley, 350 F.3d 616, the probation officer was absent for at least part of the interview, and the interview concerned an entirely separate crime. See Tr. at 163:15-164:3 (Houghton). The United States argued that, although Vasquez was not present at the September 11, 2018, interview, he was present at the September 14, 2018, interview, and he was aware of both interviews. See Tr. at 164:4-9 (Houghton). The United States also argued that, even if the Court determines that Salazar's probation terms do not constitute a waiver of his Fifth Amendment rights, the Court could apply Fifth Amendment doctrine and still determine that there are no Fifth Amendment violations. See Tr. at 165:7-10 (Houghton).

The Court expressed concern that Salazar's appearance at the probation office on September 11, 2018, was not voluntary and that he did not have notice that police officers would be present. See Tr. at 165:11-15 (Court). The Court stated that even a seasoned attorney would have a hard time leaving a room with two police officers waiting to question them and that anyone else is even less likely to feel free to leave in that situation. See Tr. at 165:16-22 (Court). The United States responded that the situation is "different than a normal encounter with a police officer on the street," but that Salazar was not told that he "must talk" to the officers, the officers did not block him from the door, and Salazar was not told that talking to the officers was "part of" his probation. Tr. at 165:23-166:11 (Houghton). The United States argued that, even if the Court does not find that Salazar waived his Fifth Amendment rights, "there is still an argument to be made on these facts that it's not a custodial interview that required Miranda." Tr. at 167:3-5 (Houghton). The United States said that the Court must also determine whether Salazar's statements are voluntary, "because there are ancillary purposes for which the United States could use" the statements, "for instance on cross-examination with respect to impeachment." Tr. at

167:5-16 (Houghton). The United States argued that, regarding the voluntariness inquiry, a promise or a threat requires only that subsequent statements be suppressed if the promise or threat "permits the defendant's will to be overborne." Tr. at 168:2-3 (Houghton). The United States argued that Salazar had contact with police officers five to ten times, by virtue of his criminal history, has "been arrested a number of times, has been given his Miranda rights, has invoked them once before," and that officers making statements such as these did not overbear a person in Salazar's position. Tr. at 168:11-20 (Houghton). The United States argues that Salazar began making admissions, not because he was coerced, but because he understood the criminal consequences which he faces as a habitual offender. See Tr. at 169:14-21 (Houghton). The United States said that Madrid's statement that officers would catch Salazar if he ran is not a custodial statement, but a warning that officers would pursue him if he breached their informal cooperation agreement. See 171:2-172:6 (Houghton).

Salazar then responded that, although probationers cede some of their Fourth Amendment rights by way of their probation terms, there is no analogous language relinquishing Fifth Amendment protections in the probation terms and that there is no State of New Mexico caselaw interpreting state probationers to waive Fifth Amendment protections. See Tr. at 174:2-175:6 (Ray). Salazar also notes that, after the September 11, 2018, interview, Salazar did not reach out to police or contact them, and the only way the officers could have contacted him was by showing up for his next mandatory probation meeting, which he cannot miss or risk violating the terms of his probation. See Tr. at 176:4-10 (Ray). Salazar argues that the September 14, 2018, meeting is not insulated from the effects of what transpired on September 11, 2018, so there is no break in the stream of events, and the Court also should not admit the September 14, 2018, statements. See

Tr. at 176:18-178:12 (Ray).

The Court stated that it would need to study the issues presented, because of the "wrinkle about probation," but stated that "it's very difficult to establish custodial, if you come in for your probation meeting," or even when examining the totality of the circumstances. Tr. at 178:15-23 (Court). The Court indicated its inclination that the situation is a police attempt to obtain Salazar's cooperation and not a custodial interrogation. See Tr. at 178:24-179:4 (Court). The Court, accordingly, stated its inclination to deny the motion but stated that it would look carefully at the law first. See Tr. at 179:13-20 (Court). The Court orally denied the motion, for the parties' planning purposes. See Tr. at 180:9-20 (Court).

## RELEVANT LAW REGARDING MIRANDA RIGHTS

Law enforcement officials must give the Miranda warnings to a person subject to "'custodial interrogation.'" United States v. Hudson, 210 F.3d 1184, 1190 (10th Cir. 2000)(quoting Miranda, 384 U.S. at 444). A person is in custody if "'his freedom of action is curtailed to a degree associated with formal arrest.'" United States v. Hudson, 210 F.3d at 1190 (quoting Berkemer v. McCarty, 468 U.S. 420, 440 (1984)). The court must examine "whether 'a reasonable [person] in the suspect's position would have understood his situation . . . as the functional equivalent of formal arrest.'" United States v. Hudson, 210 F.3d at 1190 (alterations in original)(quoting Berkemer v. McCarty, 468 U.S. at 442).

### 1.    Custodial Interrogation.

A suspect cannot invoke his Miranda rights anticipatorily; Miranda's protections do not trigger until the suspect is in a custodial interrogation context. See McNeil v. Wisconsin, 501 U.S. 171, 182 n.3 (1991). See also Appleby v. Cline, 711 F. App'x 459, 464 (10th Cir. 2017)(unpublished); United States v. Cook, 599 F.3d 1208, 1214 (10th Cir. 2010)("[I]n order

to implicate *Miranda* and *Edwards*,[11] there must be a custodial interrogation."). "'By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" Berkemer v. McCarty, 468 U.S. at 428 (quoting Miranda, 384 U.S. at 444). There are "'[t]wo discrete inquiries . . . essential to the determination'" of custody: "'first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave.'" J.D.B. v. North Carolina, 564 U.S. 261, 270 (2011)(quoting Thompson v. Keohane, 516 U.S. 99, 112 (1995)(internal quotation marks, alteration, and footnote omitted by J.D.B. v. North Carolina)). See United States v. Erving L., 147 F.3d 1240, 1245 (10th Cir. 1998). "'Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with formal arrest.'" J.D.B. v. North Carolina, 564 U.S. at 270 (quoting Thompson v. Keohane, 516 U.S. at 112 (internal quotation marks, alteration, and footnote omitted in J.D.B. v. North Carolina)). A suspect's Miranda right's, such as a suspect's right to counsel, may trigger before a law-enforcement officer gives a Miranda warning. See United States v. Bautista, 145 F.3d 1140, 1147 n.3 (10th Cir. 1998).

What amounts to custody, however, is only half of the inquiry. See United States v. Cash, 733 F.3d 1264, 1277 (10th Cir. 2013)("'The fact that [a defendant is] in custody,' however, 'does not automatically render [an] exchange an interrogation.'" (alterations in United States v.

---

[11]Edwards v. Arizona, 451 U.S. 477 (1981), held that once an individual expresses a desire for counsel, that individual is "not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." Edwards v. Arizona, 451 U.S. at 484-85.

Cash)(quoting Fox v. Ward, 200 F.3d 1286, 1298 (10th Cir. 2000)).  A suspect in custody may not

invoke his Miranda rights if he is not also interrogated.  See Rhode Island v. Innis, 446 U.S. 291,

293, 300 (1980).  Interrogation does not require "express questioning of a defendant while in

custody." Rhode Island v. Innis, 446 U.S. at 298-99.  The Supreme Court explained that Miranda

was concerned with more than just questioning, but also the "'interrogation environment,'" which

implicated practices that "did not involve express questioning." Rhode Island v. Innis, 446 U.S. at

299 (quoting Miranda, 384 U.S. at 458).  "For example, one of the practices discussed in *Miranda*

was the use of line-ups in which a coached witness would pick the defendant as the perpetrator.

This was designed to establish that the defendant was in fact guilty as a predicate for further

interrogation."  Rhode Island v. Innis, 446 U.S. at 299 (citing Miranda, 384 U.S. at 453).

> A variation on this theme discussed in *Miranda* was the so-called "reverse line-up"
> in which a defendant would be identified by coached witnesses as the perpetrator of
> a fictitious crime, with the object of inducing him to confess to the actual crime of
> which he was suspected in order to escape the false prosecution.

Rhode Island v. Innis, 446 U.S. at 299 (quoting Miranda, 384 U.S. at 453).  Accordingly, "the term

'interrogation' under *Miranda* refers not only to express questioning, but also to any words or

actions on the part of the police (other than those normally attendant to arrest and custody) that the

police should know are reasonably likely to elicit an incriminating response from the suspect."

Rhode Island v. Innis, 446 U.S. at 301 (quoting Miranda, 384 U.S at 439).  See United States v.

Cash, 733 F.3d at 1277 ("[I]nterrogation extends *only* to words or actions that the officers should

have known were reasonably likely to elicit an incriminating response."  (emphasis added by

United States v. Cash)(quoting Fox v. Ward, 200 F.3d at 1298).  "The latter portion of this

definition focuses primarily upon the perceptions of the suspect, rather than the intent of the

police." Rhode Island v. Innis, 446 U.S. at 301.  See United States v. Yepa, 862 F.3d 1252, 1257

(10th Cir. 2017).

"[C]onduct 'normally attendant to arrest and custody'" is "not the 'functional equivalent' of interrogation." Fox v. Ward, 200 F.3d at 1298 (quoting Rhode Island v. Innis, 446 U.S. at 301)(concluding that officers "merely introduc[ing] themselves" to a suspect and leaving their business cards did not constitute interrogation). The Tenth Circuit has concluded, however, that interrogation "includes those instances where a defendant is in custody and it is clear that questioning/interrogation is imminent." United States v. Bautista, 145 F.3d at 1147 n.3 (citing United States v. Kelsey, 951 F.2d 1196, 1199 (10th Cir. 1991)("It is clear from the exchange between Kelsey and the police described above that the police intended to question Kelsey at some point at his home.")). See Connecticut v. Barrett, 479 U.S. 523, 531 (1987)("[C]ustodial interrogation is inherently coercive and . . . a defendant must receive detailed warnings that he or she has the rights to remain silent to receive assistance of counsel before and during questioning."). The Tenth Circuit, however, has since walked back from United States v. Bautista and United States v. Kelsey. In United States v. Cash, a suspect was handcuffed and placed in the back of a squad car after a scuffle with the police, but that did not amount to an interrogation even though questioning was imminent. United States v. Cash, 733 F.3d at 1278-79. Rather, the Tenth Circuit focused its inquiry on specific exchanges between the suspect and officers to determine whether the officer's questions were "'reasonably likely to elicit an incriminating response'" as Rhode Island v. Innis commands. United States v. Cash, 733 F.3d at 1278-79 (quoting Rhode Island v. Innis, 446 U.S. at 301). See United States v. Yepa, 862 F.3d at 1258-61; United States v. Benard, 680 F.3d 1206, 1212 (10th Cir. 2012).

The Court has considered custodial interrogation on several occasions. In United States v. Romero, 743 F. Supp. 2d 1281, the Court applied Rhode Island v. Innis and concluded that a

suspect was subjected to interrogation, but was not in custody, so <u>Miranda</u> did not apply. <u>See</u> <u>United States v. Romero</u>, 743 F. Supp. 2d at 1332. The Court determined that a suspect was interrogated, because officers asked the suspect about his whereabouts on a Friday night, and the officer knew that the suspect was the last person to see the victim alive on Friday. <u>See</u> <u>United States v. Romero</u>, 743 F. Supp. 2d at 1332. The Court concluded, however, that the suspect was not in custody, because there was "nothing excessively coercive . . . about the circumstances of the questioning." 743 F. Supp. 2d at 1334. The suspect sat in a police vehicle while questioned, but: (i) he sat in the front seat; (ii) the car's back door was open, suggesting informality; (iii) both windows were rolled down, also suggesting informality and indicating that the suspect was not in a non-public questioning room; (iv) there was no prolonged accusatory questioning; (v) the suspect was not taken to a police station; (vi) law enforcement officers did not display their weapons; and (vii) the officers never touched the suspect. <u>See</u> 743 F. Supp. 2d at 1334-35. <u>See</u> <u>also</u> <u>United States v. Young</u>, 347 F. Supp. 3d 747, 787-89 (D.N.M. 2018)(Browning, J.)(stating that a defendant in handcuffs was in custody, but that no interrogation occurred when the officer did not ask the defendant any questions reasonably likely to elicit an incriminating response); <u>United States v. Begay</u>, 310 F. Supp. 3d 1318, 1358-59 (D.N.M. 2018)(Browning, J.)(concluding that law enforcement officers interrogated a defendant when they asked him questions, but that the interrogation was not custodial, because the officers informed the defendant that he was not under arrest and could stop the interview; because the officers did not engage in accusatory questioning; and, because, although multiple officers joined the questioning, they separated the defendant from those individuals who would provide him moral support, and the defendant could see an officer's firearm, the officers did not physically contact the defendant or suggest that the defendant had to comply); <u>id.</u> at 1362-63 (concluding that the defendant was not in custody when law enforcement

officers informed him that he did not need to answer their questions; when the officers did not engage in accusatory, prolonged questioning and asked few questions; when the defendant of his own volition separated himself from those who could lend moral support; and when the officers did not physically or orally suggest that the defendant must comply with their requests); United States v. Fox, No. CR 05-0772 JB, 2006 WL 4017485, at *10-11 (D.N.M. Oct. 29, 2006)(Browning, J.)(explaining that no Fifth Amendment violation occurred where the defendant was advised of his rights, made the incriminating statements after making his telephone call, admitted that he received no pressure to waive his rights, and was not deprived of basic physical comforts like food and sleep); United States v. Jones, 411 F. Supp. 2d 1262, 1268-72 (D.N.M. 2005)(Browning, J.)(deeming no Fifth Amendment violation where police interviewed the defendant in surroundings familiar to him, informed him of his rights, engaged in no coercive conduct, and gave the defendant a choice to speak with them and sign an advice of rights form).

## 2.    Miranda Waiver.

Waiver of a person's Fifth Amendment privilege against self-incrimination must be made "voluntarily, knowingly and intelligently." United States v. Burson, 531 F.3d 1254, 1256 (10th Cir. 2008)(citations omitted). An express statement is not required; the waiver can be inferred from the defendant's actions and words. See United States v. Nelson, 450 F.3d 1201, 1211 (10th Cir. 2006)(citing United States v. Toro-Pelaez, 107 F.3d 819, 825 (10th Cir. 1997)). "Whether this standard is met 'depends in each case upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'" United States v. Burson, 531 F.3d at 1256 (quoting Maynard v. Boone, 468 F.3d 665, 676 (10th Cir. 2006)). The government generally bears the burden of proving, by a preponderance of the evidence, that a valid waiver occurred. See United States v. Burson, 531 F.3d at 1256; United States v. Nelson, 450

F.3d at 1210-11. The Tenth Circuit has noted that this standard incorporates two distinct requirements:

> "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived."

United States v. Morris, 287 F.3d 985, 988 (10th Cir. 2002)(quoting Colorado v. Spring, 479 U.S. 564, 573 (1987)). In determining whether a waiver of rights was knowing and intelligent, the Tenth Circuit employs a totality of the circumstances approach. See United States v. Burson, 531 F.3d at 1256-57 (citing Colorado v. Spring, 479 U.S. at 573). "In determining whether rights were voluntarily waived, we consider: the suspect's age, intelligence, and education; whether the suspect was informed of his or her rights; the length and nature of the suspect's detention and interrogation; and the use or threat of physical force against the suspect." United States v. Smith, 606 F.3d 1270, 1276 (10th Cir. 2010)(citing Smith v. Mullin, 379 F.3d 919, 934 (10th Cir. 2004); United States v. Minjares-Alvarez, 264 F.3d 980, 985 (10th Cir. 2001)). A "state of intoxication does not automatically render a statement involuntary." United States v. Muniz, 1 F.3d 1018, 1022 (10th Cir. 1993). "Rather the test is 'whether a [suspect's] will was overborne by the circumstances surrounding the giving of a confession.'" United States v. Smith, 606 F.3d at 1276-77 (quoting Dickerson v. United States, 530 U.S. 428, 434 (2000)("Dickerson")(alterations in United States v. Smith)).

In United States v. Tafoya, 399 F. Supp. 2d 1227 (D.N.M. 2005)(Browning, J.), the Court considered whether a suspect had knowingly waived his Miranda rights after he was given the

warning and responded to the officer's questioning related to the investigation. See 399 F. Supp. 2d at 1238. Although the suspect was "emotional" during the questioning, he "gave clear and appropriate answers" to the questions asked of him. 399 F. Supp. 2d at 1238-39. On those facts, the Court concluded that the suspect had "made voluntary" statements. 399 F. Supp. 2d at 1239. See United States v. Begay, 310 F. Supp. 3d 1318, 1364-65 (D.N.M. 2018)(Browning, J.)(concluding that the defendant voluntarily waived Miranda rights during an interrogation).

**3.      Requests for an Attorney.**

The Fifth and Fourteenth Amendments to the Constitution of the United States of America provide the accused a "right to have counsel present during custodial interrogation." Edwards v. Arizona, 451 U.S. at 482. In Miranda, the Supreme Court held:

> If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning. If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent.

384 U.S. at 474. The Supreme Court expanded on that principle in Edwards v. Arizona, concluding that, once an individual, subject to custodial interrogation, expresses a desire for counsel, that individual is "not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." Edwards v. Arizona, 451 U.S. at 484-85. See Edwards v. Arizona, 451 U.S. at 485 ("Had Edwards initiated the meeting on January 20, nothing in the Fifth and Fourteenth Amendments would prohibit the police from merely listening to his voluntary, volunteered statements and using them against him at trial."); Davis v. United States, 512 U.S. 452, 458 (1994)("[I]f a suspect requests counsel at any time during the interview, he is not subject

to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation."). The Tenth Circuit has held that Edwards v. Arizona applies -- and a suspect can invoke a right to counsel -- before the officers have issued a Miranda warning. See United States v. Kelsey, 951 F.2d at 1199 ("It is clear from the exchange between Kelsey and the police . . . that the police intended to question Kelsey at some point at his home, and that the police understood Kelsey to be invoking his right to counsel during questioning.").

This rule amounts to a "second layer" of protection for the accused who has invoked his right to an attorney in that further communication with law enforcement does not mean that he waived his right to an attorney, unless he initiates the conversation. Maryland v. Shatzer, 559 U.S. 98, 104 (2010). "When an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." Maryland v. Shatzer, 559 U.S. at 104 (quoting Edwards v. Arizona, 451 U.S. at 484-85).

> The rationale of *Edwards* is that once a suspect indicates that "he is not capable of undergoing [custodial] questioning without advice of counsel," "any subsequent waiver that has come at the authorities' behest, and not at the suspect's own instigation, is itself the product of the 'inherently compelling pressures' and not the purely voluntary choice of the suspect.

Maryland v. Shatzer, 559 U.S. at 104-05 (quoting Arizona v. Roberson, 486 U.S. 675, 681 (1988) (Arizona v. Roberson quoting Miranda, 384 U.S. at 467)). Accordingly, "a voluntary *Miranda* waiver is sufficient at the time of an initial attempted interrogation to protect a suspect's right to have counsel present, but it is not sufficient at the time of subsequent attempts if the suspect initially requested the presence of counsel." Maryland v. Shatzer, 559 U.S. at 105. The Supreme Court noted, however, that the "*Edwards* rule is not a constitutional mandate, but judicially

prescribed prophylaxis." <u>Maryland v. Shatzer</u>, 559 U.S. at 105.[12]  A break in custody of fourteen

days or more ends the <u>Edwards v. Arizona</u> rule that a subsequent attempt to obtain a <u>Miranda</u>

waiver is ineffective when the suspect initially requested counsel.  <u>See</u> <u>Maryland v. Shatzer</u>, 559

U.S. at 110.

      The request for counsel must be clear and unequivocal.  <u>See</u> <u>Davis v. United States</u>, 512

U.S. at 459.  A "suspect need not 'speak with the discrimination of an Oxford don,'" <u>Davis v.</u>

<u>United States</u>, 512 U.S. at 459 (quoting <u>Davis v. United States</u>, 512 U.S. at 476 (Souter, J.,

concurring)), but "[i]nvocation of the <u>Miranda</u> right to counsel 'requires, at a minimum, some

statement that can reasonably be construed to be an expression of a desire for the assistance of an

attorney,'" <u>Davis v. United States</u>, 512 U.S. at 459 (quoting <u>McNeil v. Wisconsin</u>, 501 U.S. 171,

178 (1991)).  The applicability of the rule that law enforcement cease custodial interrogation upon

a clear request for counsel "requires courts to determine whether the accused actually invoked his

right to counsel."  <u>Davis v. United States</u>, 512 U.S. at 453.  An individual's "ambiguous" or

"equivocal" references to an attorney, regarding which "a reasonable officer in light of the

circumstances would have understood only that the suspect *might* be invoking the right to counsel,"

do not give rise to an invocation of the right to counsel such that police must cease questioning.

<u>Davis v. United States</u>, 512 U.S. at 453 (emphasis in original).  The Supreme Court later explained:

"If an ambiguous act, omission, or statement could require police to end the interrogation, police

would be required to make difficult decisions about an accused's unclear intent and face the

consequence of suppression 'if they guess wrong.'"  <u>Berghuis v. Thompkins</u>, 560 U.S. 370, 382

(2010)(quoting <u>Davis v. United States</u>, 512 U.S. at 461).  "Suppression of a voluntary confession

---

[12]<u>But</u> <u>see</u> <u>Dickerson v. United States</u>, 530 U.S at 460; <u>infra</u> n.19.

in these circumstances would place a significant burden on society's interest in prosecuting criminal activity." Berghuis v. Thompkins, 560 U.S. at 382.

The Supreme Court held in Davis v. United States that a defendant's statement to law enforcement agents that "[m]aybe I should talk to a lawyer" was not a clear and unequivocal request for counsel. 512 U.S. at 462. See Maryland v. Shatzer, 559 U.S. at 112 (noting that a defendant's statement that "'he would not talk about this case without having an attorney present'" satisfactorily invoked the defendant's right to an attorney (quoting Shatzer v. State, 405 Md. 585, 589, 954 A.2d 1118, 1120 (Md. 2008))); United States v. Zamora, 222 F.3d 756, 765 (10th Cir. 2000)(holding that Zamora's statement "'I might want to talk to my attorney'" is ambiguous and does not invoke the right to counsel)(quoting the agent's testimony at the suppression hearing about Zamora's statements). In United States v. Santistevan, 701 F.3d 1289 (10th Cir. 2012), the Tenth Circuit held that a letter a defendant handed to a law-enforcement agent, which read "Mr. Santistevan does not wish to speak with you without counsel" is "an unambiguous invocation of the right to counsel." United States v. Santistevan, 701 F.3d at 1292-93. Although the defendant agreed to speak with law enforcement without his attorney present almost immediately after handing over the letter, the Tenth Circuit determined that, "once the suspect unambiguously invokes the right to counsel -- as Mr. Santistevan did here by giving the letter to the agent -- all questioning must stop." United States v. Santistevan, 701 F.3d at 1293. In United States v. Lux, 905 F.2d 1379 (10th Cir. 1990), the Tenth Circuit affirmed a district court finding that a defendant did not make an unambiguous request for counsel when she asked how long it would take if she wanted a lawyer and whether she would have to stay in jail while she waited for a lawyer. United States v. Lux, 905 F.2d at 1381. See Valdez v. Ward, 219 F.3d 1222, 1232-33 (10th Cir. 2000)(holding that a non-native English speaker's statement, in response to whether he understood

his Miranda rights, that "Yes, I understand it a little bit and I sign it because I understand it [sic] something about a lawyer and he want [sic] to ask me questions and that's what I'm looking for [sic] a lawyer" is an ambiguous request for counsel); Mitchell v. Gibson, 262 F.3d 1036, 1056 (10th Cir. 2001)("Even construed most favorably to Mr. Mitchell, his statement asking police whether he needed an attorney is not, in light of the circumstances, a sufficiently clear request for counsel to require the cessation of questioning under Davis."); United States v. Sierra-Estrada, 248 F. App'x 973, 981 (10th Cir. 2007)(unpublished)(collecting appellate court cases). The Court has ruled previously that a suspect's question about "whether she needed an attorney" did not constitute a clear and unequivocal request sufficient to invoke a right to counsel. United States v. Alfaro, No. CR 08-0784 JB, 2008 WL 5992268, at *13 (D.N.M. Dec. 17, 2008)(Browning, J.). See United States v. Martinez, No. CR 02-1055 JB, 2006 WL 4079686, at *12 (D.N.M. Nov. 21, 2006)(Browning, J.)(ruling that "an inquiry whether he might need a lawyer . . . was not an unequivocal assertion of his right to counsel.").

### 4. **Midstream Miranda Warnings.**

The Supreme Court first considered midstream Miranda warnings in Oregon v. Elstad, 470 U.S. 298 (1985)("Elstad") -- a home-burglary case. In Elstad, a witness to the burglary implicated an 18-year-old neighbor -- Michael Elstad -- and, on that information, State of Oregon detectives confronted the teenager in his parents' home. See Elstad, 470 U.S. at 300. Without issuing a Miranda warning, detectives briefly questioned Elstad in his parents' living room, and Elstad admitted that he was involved in the burglary. See Elstad, 470 U.S. at 301. The detectives then escorted Elstad to the sheriff's headquarters and read him his Miranda rights. See 470 U.S. at 301. Elstad waived them and gave a full written confession. See 470 U.S. at 301-02.

On appeal, Elstad argued that his "confession was tainted by the earlier failure of the police

to provide *Miranda* warnings," Elstad, 470 U.S. at 305, and, drawing on the Fourth Amendment's fruit-of-the-poisonous-tree doctrine, see Wong Sun v. United States, 371 U.S. 471 (1963), he contended that the confession "must be excluded," Elstad, 470 U.S. at 305. The Supreme Court disagreed with Elstad, concluding that "procedural *Miranda* violation[s] differ[] in significant respects from" Fourth Amendment violations. Elstad, 470 U.S. at 306 (alterations added). It explained that, unlike a Fourth Amendment search-and-seizure violation, a Miranda violation does not necessarily mean that there was a constitutional violation. See Elstad, 470 U.S. at 306-07. The Fifth Amendment prohibits the use of compelled testimony; "[f]ailure to administer *Miranda* warnings," on the other hand, "creates a presumption of compulsion," but "unwarned statements that are otherwise voluntary" are nevertheless barred under Miranda. Elstad, 470 U.S. at 306-07. Thus, the "*Miranda* exclusionary rule" is prophylactic, and "sweeps more broadly than the Fifth Amendment itself." Elstad, 470 U.S. at 307.

That Miranda sweeps more broadly than the Fifth Amendment means that, unlike a Fourth Amendment violation, a Miranda violation does not necessarily require a confession's exclusion.[13]

---

[13]There is tension in this reasoning and with the Supreme Court's later determination in Dickerson that Miranda is a constitutional rule. See Dickerson, 530 U.S. at 437-38, 441. In Dickerson, although conceding that "we have repeatedly referred to the *Miranda* warnings as 'prophylactic,' and 'not themselves rights protected by the Constitution,'" Dickerson, 530 U.S. at 437-38 (quoting New York v. Quarles, 467 U.S. 649, 653 (1984); Michigan v. Tucker, 417 U.S. 433, 444 (1974)), the Supreme Court concluded that "*Miranda* is a constitutional decision," because (i) it had consistently applied Miranda to state court decisions and (ii) Miranda had invited legislative action "to protect the constitutional right against coerced self-incrimination," Dickerson, 530 U.S. at 438-40. If Miranda is a constitutional rule, however, it is hard to see how it can "sweep[] more broadly than the Fifth Amendment itself." Elstad, 470 U.S. at 306. It is possible that the Supreme Court meant that Miranda implicated additional constitutional amendments, such as the Fourteenth, but the statement's context in Elstad suggests that the Supreme Court meant that Miranda's exclusionary rule arose from judicial rulemaking, and not from some other Amendment beyond the Fifth. See Elstad, 470 U.S. at 305; Elstad, 470 U.S at 307 ("*Miranda's* preventive medicine provides a remedy even to the defendant who has suffered no identifiable constitutional harm."). The Supreme Court, in expressly recognizing this tension,

noted that Elstad "does not prove that *Miranda* is a nonconstitutional decision, but simply recognizes the fact that unreasonable searches under the Fourth Amendment are different from unwarned interrogation under the Fifth Amendment." Dickerson, 530 U.S. at 441. But see Dickerson, 530 U.S. at 454 (Scalia, J., dissenting)("The proposition that failure to comply with *Miranda*'s rules does not establish a constitutional violation was central to the *holdings* of [*Michigan v.*] *Tucker*, [530 U.S. 428 (2000)], [*Oregon v.*] *Hass*, [420 U.S. 714 (1975)], [*New York v.*] *Quarles*, [467 U.S. 649 (1984)], and *Elstad*.")(emphasis in original)(alterations added).

Because Elstad's reasoning to exclude fruit-of-the-poisonous-tree evidence rested, in large part, on Miranda being a nonconstitutional rule, Dickerson's determination that Miranda is a constitutional rule reopened the question why fruit-of-the-poisonous-tree evidence is not excluded after a procedurally tainted Miranda warning. See United States v. Patane, 542 U.S. 630 (2004)("Patane")(plurality op.)("Based on its understanding of *Dickerson*, the Court of Appeals rejected the post-*Dickerson* views of the Third and Fourth Circuits that the fruits doctrine does not apply to *Miranda* violations."). See also Sanchez-Llamas v. Oregon, 548 U.S. at 348 ("We have applied the exclusionary rule primarily to deter constitutional violations.").

The Supreme Court attempted to resolve this tension in Patane, but a divided court did not produce a controlling opinion. See Patane, 542 U.S. at 635-36. The Honorable Antonin G. Scalia, then-Associate Justice of the Supreme Court, the Honorable Clarence Thomas, Associate Justice of the Supreme Court, and the Honorable William H. Rehnquist, then-Chief Justice of the Supreme Court, determined that Miranda was a prophylactic rule, and that admitting "fruits" evidence from a voluntary statement did not implicate the Fifth Amendment's self-incrimination clause. Patane, 542 U.S. at 636. The plurality reasoned that, even taking Dickerson's holding to heart that Miranda is a constitutional rule, there must be a close fit between the constitutional violation and the remedy. See Patane, 542 U.S. at 643. It concluded that admitting nontestimonial fruits of a voluntary statement do not implicate the self-incrimination clause, so there is no fit between the Miranda violation and the exclusionary remedy. See Patane, 542 U.S. at 643 ("The admission of such fruit presents no risk that a defendant's coerced statements (however defined) will be used against him at a criminal trial."). In so concluding, the three justices in the plurality reaffirmed that Elstad's reasoning was sound. Patane, 542 U.S. at 639-40. The Honorable Sandra Day O'Connor and the Honorable Anthony M. Kennedy, then-Associate Justices of the Supreme Court of the United States, concurred in the judgment and agreed that Elstad is still good law after Dickerson. See Patane, 542 U.S. at 645 (Kennedy, J., concurring). The two Justices did not, however, expressly adopt the constitutional "fit" analysis that the plurality deployed. Patane, 542 U.S. at 645. They concluded that admitting nontestimonial fruits from a voluntary statement "does not run the risk of admitting into trial an accused's coerced incriminating statements against himself." Patane, 542 U.S. at 645 (Kennedy, J., concurring). Instead of concluding that such a remedy would not fit the constitutional violation, however, they concluded that excluding such evidence would not serve the police "deterrence rationale" infusing Miranda. Patane, 542 U.S. at 645 (Kennedy, J., concurring). The concurrence did not comment on Elstad's rationale that Miranda did not justify excluding "fruits" evidence, because, unlike the Fourth Amendment, Miranda is not a constitutional rule.

Elstad's constitutional reasoning, thus, may no longer be good law, but its trustworthiness and deterrence rationales may be. See Elstad, 470 U.S. at 308. Moreover, despite Dickerson's suggestion that "fruits" evidence may need to be excluded as Miranda is a constitutional rule, five

See 470 U.S. at 307; Sanchez-Llamas v. Oregon, 548 U.S. 331, 348 (2006)("We have applied the exclusionary rule primarily to deter constitutional violations.").  Indeed, the prosecution may still use a confession obtained in violation of Miranda for impeachment purposes.  See Elstad, 470 U.S. at 307.  Moreover, the Supreme Court reasoned that categorically barring a confession after a midstream Miranda warning "undercuts the twin rationales" of the prophylactic Miranda rule -- trustworthiness and deterrence.  Elstad, 470 U.S. at 308.  See Dickerson, 530 U.S. at 433 ("The roots of this test developed in the common law, as the courts of England and then the United States recognized that coerced confessions are inherently untrustworthy.").

> "A free and voluntary confession is deserving of the highest credit, because it is presumed to flow from the strongest sense of guilt . . . but a confession forced from the mind by the flattery of hope, or by the torture of fear, comes in so questionable a shape . . . that no credit ought to be given to it; and therefore it is rejected."

Dickerson, 530 U.S. at 433 (quoting King v. Warickshall, 1 Leach 262, 263-64, 168 Eng. Rep. 234, 235 (K.B. 1783)).  If the post-Miranda confession is otherwise knowing and voluntary, its trustworthiness is not in doubt.  See Elstad, 470 U.S. at 308.  The deterrence rationale likewise loses force when the officers acted in good faith compliance with Miranda.  See Elstad, 470 U.S. at 308 (citing Michigan v. Tucker, 417 U.S. 433, 447-48 (1974)).  Accordingly, the Supreme Court held that, once the Miranda warning is made, "the admissibility of any subsequent statement

---

justices eschewed that suggestion in Patane.  Patane, 542 U.S. at 643, 645.  Accordingly, the Court concludes that a procedural Miranda violation does not require the Court to exclude nontestimonial evidence from a voluntary statement based on a fruit-of-the-poisonous-tree theory.  See Wong Sun v. United States, 371 U.S. at 471; United States v. Phillips, 468 F.3d 1264, 1266 (10th Cir. 2006).

Furthermore, the Court would join the Justices who have noted that Miranda is not properly rooted or found in the Constitution, but instead is the product of the Supreme Court's power to provide prophylactic rules.  See Maryland v. Shatzer, 559 U.S. at 106.  It may not be a bad rule in that it has -- with its bright-line application -- made a lot of otherwise fuzzy confessions valuable and protected police in their work, but its constitutional and judicial underpinnings are shaky if not non-existent.

should turn . . . solely on whether it is knowingly and voluntarily made." Elstad, 470 U.S. at 309. See Elstad, 470 U.S. at 318 ("The relevant inquiry is whether, in fact, the second statement was also voluntarily made. As in any such inquiry, the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements.").

Extrapolating from that test, the Supreme Court concluded that Elstad's pre- and post-Miranda confessions were voluntary, and therefore admissible. See Elstad, 470 U.S. at 314-15. It noted that, "[w]hen a prior statement is actually coerced, the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators all bear on whether that coercion has carried over into the second confession." Elstad, 470 U.S. at 310. However, where the initial confession is voluntary, "a break in the stream of events" is not needed for the second confession to be admissible. Elstad, 470 U.S. at 310. Rather, the Miranda warning "serves to cure the condition that rendered the unwarned statement inadmissible." Elstad, 470 U.S. at 311.

In Elstad, the Supreme Court reasoned that the initial confession "took place at midday" in Elstad's living room with his mother "a few steps away," so it was voluntary. Elstad, 470 U.S. at 315. With no additional facts demonstrating that the second confession, post-Miranda was elicited under coercive conditions, the Supreme Court deemed it admissible. See Elstad, 470 U.S. at 314. That Elstad had "'let the cat out of the bag by confessing,'" Elstad, 470 U.S. at 311 (quoting United States v. Bayer, 331 U.S. 532, 540 (1947)), with his first statement in no way created a "presumption of compulsion" for the second statement, Elstad, 470 U.S. at 314. Dissenting justices noted that there may be a "'psychological impact of a *voluntary* disclosure of a guilty secret,'" but such disclosure, as a matter of law, does not qualify "'as state compulsion' nor

'compromises the voluntariness' of subsequent confessions." Elstad, 470 U.S. at 312 (Brennan, J., dissenting, joined by Marshall, J.)(emphasis in Elstad)(quoting Elstad, 470 U.S. at 312, 326) .

The Supreme Court next considered midstream-Miranda warnings in Missouri v. Seibert, 542 U.S. 600 (2004)("Seibert"), and issued only a plurality opinion. Seibert, 542 U.S. at 603-05.[14] In Seibert, a young boy with cerebral palsy died in his sleep, and his mother feared charges of neglect, because the boy's body was covered in bedsores. See Seibert, 542 U.S. at 604. The mother, along with two of her remaining sons and family friends, conspired to conceal the evidence of neglect by burning the family's mobile home with the boy's dead body in it. See Seibert, 542 U.S. at 604. To avoid the appearance that they had left the boy unattended, they arranged for Donald Rector, a mentally-ill teenager living with the family, to remain in the mobile home while they set fire to it. See Seibert, 542 U.S. at 604. The conspirators executed their plan, and Rector died in the fire. See Seibert, 542 U.S. at 604.

Missouri officers subsequently arrested the mother. See Seibert, 542 U.S. at 604. Officer Kevin Clinton refrained from issuing her a Miranda warning on instructions from police headquarters. See Seibert, 542 U.S. at 604. Another officer, Richard Hanrahan, questioned her at the police station for thirty-forty minutes without a Miranda warning, and she eventually admitted that Rector "was meant to die in the fire." Seibert, 542 U.S. at 605. After a twenty-minute break, Hanrahan issued a Miranda warning, obtained a signed waiver of rights and secured the same

_____

[14]The Honorable David H. Souter, then-Associate Justice of the Supreme Court, announced the Court's judgment and delivered an opinion joined by the Honorable John Paul Stevens, the Honorable Ruth Bader Ginsburg, and the Honorable Stephen G. Breyer, Associate Justices of the Supreme Court. See Seibert, 542 U.S. at 603. Justice Breyer filed a concurrence, and Justice Kennedy concurred in the judgment. See Seibert, 542 U.S. at 617-18. Justice O'Connor, joined by then-Chief Justice Rehnquist and Justices Scalia and Thomas, dissented. See Seibert, 542 U.S. at 622.

confession with a similar line of questioning.  See Seibert, 542 U.S. at 605.  According to

Hanrahan, he consciously decided to withhold the Miranda warning in accordance with a

sanctioned interrogation technique that he had been taught: "question first, then give the warnings,

and then repeat the question until he got the answer previously given."  Seibert, 542 U.S. at 600.

On appeal, the Supreme Court noted that Hanrahan's tactic of question first, issue Miranda

warnings later, was not confined to Missouri.  See Seibert, 542 U.S. at 609.  The Supreme Court

further noted that such a tactic was at odds with Miranda's purpose; Miranda sought to ensure that

individuals made a "'free and rational choice,'" Seibert, 542 U.S. at 601 (quoting Miranda, 384

U.S. at 464-65), with full knowledge of their constitutional rights before speaking with officers,

whereas "[t]he object of question-first is to render *Miranda* warnings ineffective by waiting for a

particularly opportune time to give them, after the suspect has already confessed," Seibert, 542

U.S. at 611.  The plurality continued:

> [I]t is likely that if the interrogators employ the technique of withholding warnings
> until after interrogation succeeds in eliciting a confession, the warnings will be
> ineffective in preparing the suspect for successive interrogation, close in time and
> similar in content. . . .  Upon hearing warnings only in the aftermath of interrogation
> and just after making a confession, a suspect would hardly think he had a genuine
> right to remain silent, let alone persist in so believing once the police began to lead
> him over the same ground again. . . .  What is worse, telling a suspect that "anything
> you say can and will be used against you," without expressly excepting the
> statement just given, could lead to an entirely reasonable inference that what he has
> just said will be used, with subsequent silent being of no avail.  Thus, when
> *Miranda* warnings are inserted in the midst of coordinated and continuing
> interrogation, they are likely to mislead and "depriv[e] a defendant of knowledge
> essential to his ability to understand the nature of his rights and the consequences
> of abandoning them."

Seibert, 542 U.S. at 613-14 (quoting Moran v. Burbine, 475 U.S. 412, 424 (1986)).  But see Seibert,

542 U.S. at 627 (O'Connor, J., dissenting)(critiquing these statements as adopting the "cat out of

the bag" theory that the Supreme Court rejected in Elstad).  Accordingly, the plurality held that

"[t]he threshold issue when interrogators question first and warn later is thus whether it would be reasonable to find that in these circumstances the warnings could function 'effectively' as *Miranda* requires."  Seibert, 542 U.S. at 611-12 (quoting Miranda, 384 U.S. at 467).

The plurality concluded that the following factors bear on whether a midstream Miranda warning can be effective:

> [(i)] the completeness and detail of the questions and answers in the first round of interrogation[; (ii)] the overlapping content of the two statements[; (iii)] the timing and setting of the first and the second[; (iv)] the continuity of police personnel, and [(v)] the degree to which the interrogator's questions treated the second round as continuous with the first.

Seibert, 542 U.S. at 615.  In its analysis, the plurality added another factor: whether officers advise the suspect that the pre-Miranda confession could not be used against him.  See Seibert, 542 U.S. at 616 n.7.  Conspicuously absent from those factors is the officer's intent, but the plurality noted that, "[b]ecause the intent of the officer will rarely be as candidly admitted as it was here (even as it is likely to determine the conduct of the interrogation), the focus is on facts apart from intent that show the question-first tactic at work."  542 U.S. at 616 n.6.  The plurality concludes that the midstream Miranda warning was ineffective, because the pre- and post-Miranda questioning occurred in the same location, the post-Miranda phase occurred only twenty minutes after the pre-Miranda phase, the officers treated the two phases of questioning as continuous, and the pre-Miranda phase left "little, if anything, of incriminating potential left unsaid."  Seibert, 542 U.S. at 616-17.

In so holding, the plurality contrasted Seibert with Elstad, and concludes that the officer's failure to warn in Elstad was a good faith Miranda mistake, and that "any causal connection between the first and second [admissions] to the police was 'speculative and attenuated.'"  Seibert, 542 U.S. at 615 (quoting Elstad, 470 U.S. at 313).  "In *Elstad*, it was not unreasonable to see the

occasion for questioning at the station house as presenting a markedly different experience from the short conversation at home," because a reasonable person "could have seen the station house questioning as a new and distinct experience." Seibert, 542 U.S. at 615. Moreover, the police station interrogation went "well beyond the scope of the laconic prior admission" in the suspect's living room. 542 U.S. at 614. Justice Breyer concurred, noting that, "[i]n my view, the following simple rule should apply to the two-stage interrogation technique: Courts should exclude the 'fruits' of the initial unwarned questioning unless the failure to warn was in good faith." Seibert, 542 U.S. at 617 (Breyer, J., concurring). He joined "the plurality's opinion in full," however, because he believed that "the plurality's approach in practice will function as a 'fruits' test." Seibert, 542 U.S. at 618 (Breyer, J., concurring)(quoting Wong Sun v. U.S., 371 U.S. at 477).

Justice Kennedy concurred in the judgment, but wrote separately and adopts a different test. Seibert, 542 U.S at 622 (Kennedy, J., concurring). First, he extrapolated a general principle from the Supreme Court's Miranda cases: "Evidence is admissible when the central concerns of *Miranda* are not likely to be implicated and when other objectives of the criminal justice system are best served by its introduction." Seibert, 542 U.S. at 618-19 (Kennedy, J., concurring). From that general principle, he concluded that an officer's deliberate intent to withhold a Miranda warning in an effort to obtain a confession without informing a suspect of his rights "distorts the meaning of *Miranda* and furthers no legitimate countervailing interest." Seibert, 542 U.S. at 621 (Kennedy, J., concurring). He disagreed with the plurality, however, because the test the plurality articulated "cuts too broadly." Seibert, 542 U.S. at 622 (Kennedy, J., concurring).

> *Miranda's* clarity is one of its strengths, and a multifactor test that applies to every two-stage interrogation may serve to undermine that clarity. Cf. *Berkemer v. McCarty*, 468 U.S. 420, 430 . . . (1984). I would apply a narrower test applicable only in the infrequent case, such as we have here, in which the two-step interrogation technique was used in a calculated way to undermine the *Miranda*

warning.

Seibert, 542 U.S. at 622 (Kennedy, J., concurring).  Accordingly, Justice Kennedy articulated the following test:

> The admissibility of postwarning statements should continue to be governed by the principles of *Elstad* unless the deliberate two-step strategy was employed. If the deliberate two-step strategy has been used, postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made.

Seibert, 542 U.S at 622 (Kennedy, J., concurring).[15]

Justice O'Connor, joined by Chief Justice Rehnquist, and Justices Scalia and Thomas, dissented.  See Seibert, 542 U.S. at 622 (O'Connor, J., dissenting).  The dissenting justices concluded that Elstad's voluntarinessf inquiry should control, and not a multi-factor balancing test or a subjective-intent test.  See Seibert, 542 U.S. at 622-23, 628 (O'Connor, J., dissenting). According to those justices, a test focusing on the officer's subjective intent missed the mark, because "[f]reedom from compulsion lies at the heart of the Fifth Amendment," so the officer's state of mind is irrelevant.  Seibert, 542 U.S. at 624-25 (O'Connor, J., dissenting)("Thoughts kept inside a police officer's head cannot affect [the suspect's] experience.").  The plurality's approach, on the other hand, was defective, because it adopted the "cat out of the bag theory" that the Supreme Court had rejected in Elstad.  542 U.S. at 627 (O'Connor, J., dissenting).  The dissent noted that there are psychological effects on a suspect who confesses pre-Miranda and then endures questioning on the same subjects post-Miranda, but the Supreme Court had "refused to endo[w] those psychological effects with constitutional implications" in Elstad.  542 U.S. at 627

---

[15]The Supreme Court later applied Seibert in a per curiam review of a habeas petition, but it did not resolve which test was controlling as it applied both the plurality's factors and factors which Justice Kennedy's concurrence articulated.  See Bobby v. Dixon, 565 U.S. 23, 30-32 (2011)(per curiam).

(O'Connor, J., concurring)(alteration in original). The dissent explained that to adopt that approach "would effectively immuniz[e] a suspect to pre-*Miranda* warning questions from the consequences of his subsequent informed waiver, an immunity that comes at a high cost to legitimate law enforcement activity." 542 U.S. at 627 (O'Connor, J. dissenting)(alteration in original). Accordingly, the dissent would have ordered a remand for the state court to determine whether the statements were voluntarily made. See 542 U.S. at 628 (O'Connor, J. dissenting).

No published Tenth Circuit opinion has determined what opinion from Seibert is controlling. In United States v. Carrizales-Toledo, 454 F.3d 1142 (10th Cir. 2006), the Tenth Circuit considered the issue at length, but then declined to decide it. See 454 F.3d at 1151. It recognized that the rule from Marks v. United States, 430 U.S. 188 (1977) ordinarily dictates that the Supreme Court's holding "may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." United States v. Carrizales-Toledo, 454 F.3d at 1151 (citing Marks v. United States, 430 U.S. at 193). The Tenth Circuit noted, however, that "the *Marks* rule produces a determinate holding 'only when one opinion is a logical subset of other, broader opinions'" and that "[w]e do not apply *Marks* when the various opinions supporting the Court's decision are mutually exclusive." United States v. Carrizales-Toledo, 454 U.S. at 1151 (quoting King v. Palmer, 950 F.2d 771, 781 (D.C. Cir. 1991)(en banc)). "Determining the proper application of the *Marks* rule to *Seibert* is not easy, because arguably Justice Kennedy's proposed holding in his concurrence was rejected by a majority of the Court." United States v. Carrizales-Toledo, 454 F.3d at 1151 (citing United States v. Rodriguez-Preciado, 399 F.3d 1118, 1138-41 (9th Cir. 2005)(Berzon, J., dissenting in part)). After explaining that three of the four justices in the plurality and the four dissenters decisively rejected Justice Kennedy's test -- what it characterized as a "subjective [test]" -- the Tenth Circuit skirted the issue by holding that the

statements at issue in United States v. Carrizales-Toledo, "would be admissible under the tests proposed by the plurality and by the concurring opinion." United States v. Carrizales-Toledo, 454 F.3d at 1151 (brackets in original).

Applying the plurality's five-factor test first, the Tenth Circuit concluded that all five factors weighed toward admitting the statement. See United States v. Carrizales-Toledo, 454 F.3d at 1151-52. The first factor -- "the completeness and detail of the questions and answers in the first round of interrogation" -- weighed toward admitting the suspect's statements, because the initial questioning was brief and "spontaneous." 454 F.3d at 1152. The second factor -- "the overlapping content of the statements" -- weighed toward admissibility, because the suspect "provided significant new information" during the second round of questioning. 454 F.3d at 1152. The third and fourth factors -- "the timing and setting of the first and second," and "the continuity of police personnel" -- similarly balanced toward admissibility, because new agents joined the second round of questioning, and the second interview occurred at a different location, so it "was a new and distinct experience." 454 F.3d at 1152. The fifth factor, which the Tenth Circuit characterized as "the most important factor" -- "the degree to which the interrogator's questions treated the second round as continuous with the first" -- also weighed toward admissibility, because the questioning agents never "referred back to [the suspect's] initial statements during the second interrogation." 454 F.3d at 1152.

Applying the subjective-intent test, the Tenth Circuit concluded that "the suddenness" of the suspect's initial confession, "the fact that [the suspect's] confession was in response" to the law-enforcement agent's first question, "and the open-ended nature of the question" all suggest that the agent "did not anticipate the confession." United States v. Carrizales-Toledo, 454 F.3d at 1153. The Tenth Circuit thus concluded that there was no subjective intent to circumvent Miranda.

See United States v. Carrizales-Toledo, 454 F.3d at 1153. Because the agent obtained the first confession in good faith, the only remaining question is whether the initial confession was voluntary. See United States v. Carrizales-Toledo, 454 F.3d at 1153 ("Unless his initial confession was involuntary . . . [the suspect's] motion to suppress the second confession was properly denied."). The Tenth Circuit determined that the hallmarks of coercion were missing. See 454 F.3d at 1153. The suspect was a thirty-three-years-old, a year shy of obtaining a chemical engineering degree, the questioning was short, and the agent did not threaten the suspect with physical punishment. See 454 F.3d at 1153. Accordingly, the Tenth Circuit admitted the initial confession. See 454 F.3d at 1153.

The only other Tenth Circuit cases to have addressed midstream Miranda warnings are unpublished. See United States v. Sanchez-Gallegos, 412 F. App'x 58 (10th Cir. 2011)(unpublished); United States v. Crisp, 371 F. App'x 925 (10th Cir. 2010)(unpublished). In United States v. Sanchez-Gallegos, a per curiam affirmance with three concurring judges, the Honorable David Ebel, United States Circuit Judge for the Tenth Circuit, determined in a concurring opinion that a confession obtained after a midstream Miranda warning was admissible. See United States v. Sanchez-Gallegos, 412 F. App'x at 72-73 (Ebel, J., concurring).[16] He adopted Justice Kennedy's concurrence from Seibert. See United States v. Sanchez-Gallegos, 412 F. App'x at 72 (Ebel, J., concurring)(noting a lopsided Court of Appeals split on the issue with the majority of Courts of Appeals treating Justice Kennedy's concurrence as controlling). He characterized Justice Kennedy's test as a two-step inquiry: (i) was the two-step interrogation

---

[16]In their concurrences, the Honorable Mary Briscoe, then-Chief Judge of the Tenth Circuit, and the Honorable Jerome Holmes, United States Circuit Judge for the Tenth Circuit, did not reach the midstream-Miranda issue. See United States v. Sanchez-Gallegos, 412 F. App'x at 67 (Holmes, J., concurring); id. at 69 (Briscoe, J., concurring).

technique used purposefully to undermine the Miranda process; and (ii) if not, the post-Miranda statement is admissible if the pre-Miranda interrogation was not coercive. See United States v. Sanchez-Gallegos, 412 F. App'x at 72-73 (Ebel, J., concurring). Judge Ebel determined that there was no evidence that the law-enforcement agents intended to undermine Miranda with the two-step process they employed. See 412 F. App'x at 72-73 (Ebel, J., concurring). Instead, the record reflected that Border Patrol agents asked an unplanned question to a driver crossing the Mexican border on legitimate suspicion that the driver was smuggling children into the United States from Mexico. See 412 F. App'x at 59-60 (Ebel, J., concurring). Judge Ebel also concluded that the pre-Miranda statements were not coerced, because the questioning, although accusatory, did not have the other hallmarks of coercion -- e.g., the suspect was not threatened with physical mistreatment, thrown into a holding cell, or questioned for a lengthy period before a Miranda warning was given. See 412 F. App'x at 71, 73 (Ebel, J., concurring).

In United States v. Crisp, the Tenth Circuit, in an opinion that Judge Holmes wrote, and in which Chief Judge Briscoe and the Honorable William Holloway, United States Circuit Judge for the Tenth Circuit joined, again declined to decide which test to apply to midstream Miranda warnings. See 371 F. App'x at 929. In that case, Oklahoma officers arrested Crisp after Crisp fled on foot from his vehicle at a traffic stop. See 371 F. App'x at 926. A small bag of marijuana was later found on the route that Crisp took while fleeing from officers. See 371 F. App'x at 926. After taking Crisp to a police station, but before issuing a Miranda warning, Crisp and the officers "bantered" about "the pursuit," including "how Mr. Crisp had pulled his hamstring as he fled," Crisp's "social agenda for the evening," and how Crisp's companion in the car smelled of marijuana. 371 F. App'x at 926. Responding to an officer's question whether Crisp's companion had smoked marijuana that evening, Crisp admitted that he was the one who had been smoking

weed.  See 371 F. App'x at 926.  Officers then issued Miranda warnings, which Crisp waived.  See 371 F. App'x at 926.  Crisp also asserted that he was presently sober and that he understood his rights, noting that "this ain't my first rodeo."  371 F. App'x at 926.  The officers re-questioned Crisp about using marijuana and also secured a confession that Crisp possessed a stash of cocaine at his mother's house.  See 371 F. App'x at 926-27.

The Tenth Circuit applied three tests -- the Seibert plurality's five-factor balancing test, Justice Kennedy's "intent-based" Seibert test, and the Elstad voluntary test -- and concluded that, under all three, Crisp's post-Miranda statements were admissible.  371 F. App'x at 929.  Crisp's statements were admissible under the Seibert plurality, because: (i) the pre-Miranda questions were "brief," (ii) the pre- and post-Miranda statements did not overlap as to the cocaine admission; and (iii) the officers did not treat the interrogations as continuous with regard to the cocaine topic.  371 F. App'x at 930-31.  That the officers and the interview room were the same for both the pre- and post-Miranda interrogation weighed "against the admissibility of the self-incriminating statements," but the Tenth Circuit did not find those two factors dispositive and ruled that "the efficacy of the Miranda warnings would appear not to have been materially called into question."  371 F. App'x at 930-31.

The result was the same under Justice Kennedy's Seibert concurrence.  See 371 F. App'x at 931-32.  The Tenth Circuit concluded that there was no evidence of intent to circumvent Miranda: "[T]o the contrary, the pre-Miranda statement occurred after the parties had bantered about the pursuit and in response to a question about the marijuana use of Mr. Crisp's female companion."  371 F. App'x at 932.  Moreover, Crisp's pre-Miranda admissions "were unrelated to the post-Miranda statements regarding cocaine."  371 F. App'x at 932.  Accordingly, Crisp's statements were also admissible under Justice Kennedy's Seibert concurrence.

Finally, there was no indicia of coercion surrounding Crisp's confession, so the statements were also admissible under the <u>Elstad</u> voluntary test. <u>See</u> 371 F. App'x at 932-33. The Tenth Circuit concluded that the following factors weighed toward finding his confession voluntary: (i) Crisp was thirty-nine years old; (ii) he was a high school graduate; (iii) he had experience with the criminal justice system based on his statement that "this ain't my first rodeo"; and (iv) he was not subjected to any physical punishment or threats of punishment. <u>See</u> 371 F. App'x at 932. Accordingly, the Tenth Circuit determined that, under all three tests, Crisp's post-<u>Miranda</u> statements were admissible. <u>See</u> 371 F. App'x at 933.

## <u>RELEVANT LAW REGARDING VOLUNTARINESS OF STATEMENTS</u>

The Fifth Amendment provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. The Due Process Clause requires that, to be admissible, statements by a defendant must have been made voluntarily. <u>See</u> <u>Dickerson</u>, 530 U.S. at 433 ("Over time, our cases recognized two constitutional bases for the requirement that a confession be voluntary to be admitted into evidence: the Fifth Amendment right against self-incrimination and the Due Process Clause of the Fourteenth Amendment.")(citing <u>Brown v. Mississippi</u>, 297 U.S. 278 (1936), and <u>Bram v. United States</u>, 168 U.S. 532, 542 (1897)).

> It is now axiomatic that a defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession, without regard for the truth or falsity of the confession, and even though there is ample evidence aside from the confession to support the conviction.

<u>Jackson v. Denno</u>, 378 U.S. 368, 376 (1964)(citation omitted).

The Supreme Court has declared that a defendant has the constitutional right "at some stage in the proceedings to object to the use of the confession and to have a fair hearing and a reliable determination on the issue of voluntariness." <u>Jackson v. Denno</u>, 378 U.S. at 376-77 (citation

omitted).  The United States must show that the statement was voluntary by a preponderance of the evidence.  See Missouri v. Seibert, 542 U.S. at 608 n.1; Lego v. Twomey, 404 U.S. 477, 489 (1972)("[T]he prosecution must prove at least by a preponderance of the evidence that the confession was voluntary."); United States v. McCullah, 76 F.3d 1087, 1100 (10th Cir. 1996)("The prosecution has the burden of proving by at least a preponderance of evidence that the confession was voluntary." (citation omitted)).

The due process voluntariness test examines "whether a defendant's will was overborne by the circumstances surrounding the giving of a confession."  Dickerson, 530 U.S. at 434 (internal quotations omitted)(quoting Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973)).  "The due process test takes into consideration the totality of all the surrounding circumstances -- both the characteristics of the accused and the details of the interrogation."  Dickerson, 530 U.S. at 434 (internal quotations omitted)(citations omitted).  The Court must weigh "the circumstances of pressure against the power of resistance of the person confessing."  Dickerson, 530 U.S. at 434 (internal quotations omitted)(quoting Stein v. New York, 346 U.S. 156, 185 (1953)).  The Supreme Court reaffirmed this analysis in 2000.  See Dickerson, 530 U.S. at 434 ("We have never abandoned this due process jurisprudence, and thus continue to exclude confessions that were obtained involuntarily.").

The Supreme Court has instructed that, "[a]bsent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law."  Colorado v. Connelly, 479 U.S. 157, 164 (1986).  In reviewing its cases in which it suppressed evidence, the Supreme Court has recognized that "all have contained a substantial element of coercive police conduct."  Colorado v. Connelly, 479 U.S. at 164.

The Court analyzed voluntariness in <u>United States v. Martinez,</u> No. CR 02-1055 JB, 2006 WL 4079686, at *13-14 (D.N.M. Nov. 21, 2006)(Browning, J.). There, it concluded that a defendant voluntarily confessed where he was in custody for five hours and interrogated for only about two hours. <u>See</u> 2006 WL 4079686, at *14. While the defendant argued that agents had made promises of leniency to him, the Court concluded that "the agents indicated to him that they could not make him any promises," and that his fate was in the hands of the judge and prosecutors. 2006 WL 4079686, at *14. The defendant also signed a <u>Miranda</u> waiver and a statement that no promises had been made to him. 2006 WL 4079686, at *14.

## ANALYSIS

The Court grants in part and denies in part the Motion. It will suppress Salazar's statements made to law enforcement officers on September 11, 2018, and any evidence subsequently obtained as a result of those statements. The Court will not suppress Salazar's statements made to law enforcement officers on September 14, 2018. The Court concludes that: (i) Salazar was not in custody during the portions of his interviews with Trujillo and Madrid on September 11, 2018, that he seeks to suppress; (ii) Salazar's September 11, 2018, statements were the result of improper police coercion; and (iii) this coercion had dissipated when Salazar made subsequent statements on September 14, 2018.

## I.   SALAZAR WAS NOT SUBJECTED TO A CUSTODIAL INTERROGATION.

The United States contends that Salazar was not in custody at the time Salazar made the relevant statements. <u>See</u> Response at 14. The Court agrees that the facts and circumstances surrounding Salazar's statements do not indicate that he was "in custody" at the various times in which he spoke with Trujillo and Madrid on September 11, 2018. The Court therefore declines to

conclude that Salazar was subjected to a custodial interrogation and further declines to conclude that Salazar's Fifth Amendment rights under Miranda were violated.

Both the Supreme Court and the Tenth Circuit have held that an individual is not "in custody" for Miranda purposes simply because the individual is the target of an investigation or a suspect in a crime. E.g., Stansbury v. California, 511 U.S. at 319 ("We hold, not for the first time, that an officer's subjective and undisclosed view concerning whether the person being interrogated is a suspect is irrelevant to the assessment whether the person is in custody."); United States v. Leach, 749 F.2d 592, 599-600 (10th Cir. 1984)(refusing to classify defendant as "in custody" merely because he was the target of a counterfeit note investigation). In other words, police officers need not give Miranda warnings for every question they utter. See United States v. Jones, 523 F.3d at 1239. Law enforcement officials must give Miranda warnings to a person subject to "custodial interrogation." United States v. Hudson, 210 F.3d at 1190 (citing Miranda, 384 U.S. at 444).

A person is in custody if "his freedom of action is curtailed to a degree associated with formal arrest." United States v. Hudson, 210 F.3d at 1190 (citing Berkemer v. McCarty, 468 U.S. 420, 440 (1984)). The Court must examine "whether a reasonable [person] in the suspect's position would have understood his situation . . . as the functional equivalent of formal arrest." United States v. Hudson, 210 F.3d at 1190 (brackets in original). The Tenth Circuit has instructed that the Court must consider several non-exhaustive factors in determining whether a custodial interrogation took place. See United States v. Jones, 523 F.3d at 1240. Those factors include: (i) whether the suspect is informed that he or she may end the interview at will, or is not required to answer questions; (ii) whether the questioning's nature is likely to create a coercive environment from which a suspect would not feel free to leave, such as where there is prolonged accusatory

questioning; and (iii) whether the police dominate the encounter with the suspect. See United States v. Jones, 523 F.3d at 1240 (quoting United States v. Griffin, 7 F.3d 1512, 1518 (10th Cir. 1993)). The Tenth Circuit has emphasized that "[a]lthough these factors are useful, we emphasize that we must look to the totality of the circumstances and consider the police-citizen encounter as a whole, rather than picking some facts and ignoring others." United States v. Jones, 523 F.3d at 1240. Accordingly, after discussing the first three factors from United States v. Jones, the Court will analyze other factors it considers relevant.

The first factor that United States v. Jones lists -- whether a defendant "is made aware he or she is free to refrain from answering questions or to end the interview at will," 523 F.3d at 1240 -- weighs in favor of concluding that Salazar was in custody. Madrid and Trujillo did not expressly inform Salazar that he was free to end the questioning or physically leave the interview. See generally Sept. 11 Tr. at 1-55. Trujillo alluded, however, to the fact that Salazar could leave if he wanted, stating half-an-hour into the interview that, "[y]ou know, if you're gonna be a man, I'd rather you just say, 'Fuck you guys,' and get the fuck outta here, man. But if you say somethin', be a man about it and tell the truth. You get what I'm sayin'?" Recording at 29:18-27; Sept. 11 Tr. at 35:3-5 (Trujillo). While Salazar's interview transcript does not, therefore, clearly indicate whether a similarly situated defendant would have felt free to end the interview, one additional factor suggests that a suspect in Salazar's place would not have felt like he or she could have ended the interview. As Salazar entered the probation office, his probation officer ordered him to meet with the police officers. See FOF ¶ 28, at 7. In Salazar's Order of Probation, he agrees that he "will follow all orders and instructions of [his] Probation/Parole Officer." Order of Probation at

1. See FOF ¶ 162, at 28.

Meeting with a probation officer, or with a probation officer and police officers together, does not automatically mean that a defendant is in custody even though failing to do so could lead to the defendant returning to prison. In Minnesota v. Murphy, 465 U.S. 420, 430-31 (1984), a suspect met with his probation officer who asked the suspect about a rape and murder the suspect had, in his outpatient sex offender treatment program, admitted to committing. See 465 U.S. at 422-24. The Supreme Court held that the defendant was not in custody, because "there was no 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." Minnesota v. Murphy, 465 U.S. at 430 (quoting California v. Beheler, 463 U.S. 1121, 1125 (1983)). The Supreme Court emphasized in a footnote that the defendant "was not under arrest and that he was free to leave at the end of the meeting," but that "[a] different question would be presented if he had been interviewed by his probation officer while being held in police custody or by the police themselves in a custodial setting." 465 U.S. at 429 n.5. Even when police interrogate suspects at their probation or parole officer's offices, Courts of Appeals have still concluded that the suspects are not in custody. In United States v. Cranley, 350 F.3d 617 (7th Cir. 2003)(Posner, J.), the Seventh Circuit held that a defendant was not in custody when he was interrogated by a police officer in the presence of his probation officer at the probation office. See 350 F.3d at 619. The Seventh Circuit reached this conclusion in part because the probation office shared a building with the department of motor vehicles and the department of natural resources, rather than a police department, a jail, or a courthouse. See 350 F.3d at 620. The United States Court of Appeals for the Eighth Circuit, meanwhile, concluded that a defendant was not in custody even when the probation office shared a building with a courthouse and a sheriff's office, and the defendant was interrogated inside the sheriff's office without the defendant probation officer

present.  See United States v. Aldridge, 664 F.3d 705, 709 (8th Cir. 2011).  The Eighth Circuit

reached this conclusion, because, even though the police dominated the encounter and used

deception in their interrogation, the defendant was told he could leave at any time, had unimpeded

mobility during the questioning, acquiesced to the questioning, and was not arrested at the

interrogation's conclusion.  See 664 F.3d at 712.  But see United States v. Barnes, 713 F.3d 1200,

1204 (9th Cir. 2013)(per curiam)(holding that a defendant was in custody when he was ordered

into his parole officer's building at a different time than his usual appointment, he was searched

before being admitted, his parole officer misrepresented the meeting's purpose and did not respond

when the defendant called to reschedule, FBI agents directly confronted him with evidence of guilt

and told him that they had all the evidence they needed against him, and interrogated him for two

hours); United States v. Ollie, 442 F.3d 1135, 1139 (8th Cir. 2006)(holding that, when a parole

officer ordered a defendant to report to the police station, the subsequent interview occurred in a

"police-dominated atmosphere," and the defendant was in custody).  The Court concludes that,

consistent with United States v. Cranley, United States v. Aldridge, United States v. Barnes, and

United States v. Ollie, the order from Salazar's probation officer to meet with Madrid and Trujillo

is a factor in whether the subsequent meeting was custodial -- but it is not conclusive.

The next factor to analyze is the "'nature of questioning,'" and whether it was likely to

create a coercive environment from which a suspect would not feel free to leave.  United States v.

Jones, 523 F.3d at 1240 (quoting United States v. Griffin, 7 F.3d at 1518).  Several facts suggest

that the interview's nature did not create a coercive environment.  First, Salazar was not confronted

with any direct evidence of his own guilt.  See United States v. Revels, 510 F.3d 1269, 1276 (10th

Cir. 2007)(holding that a defendant was in custody, because officers separated the defendant from

her boyfriend and children, and then directly confronted her with evidence seized from her

residence); United States v. Rith, 164 F.3d 1323, 1332 (10th Cir. 1999)(holding that a suspect was not in custody "until the point at which he was confronted with the illegal shotgun").  Madrid and Trujillo at various times implied that they did not currently have any hard evidence implicating him.  See Recording at 02:19-02:40 (asking whether Salazar would be on video cameras going to anyone's house asking for a package); Sept. 11 Tr. at 8:6-19 (Madrid)(same); id. at 7:8 (Madrid)("Is your DNA gonna come back on my package?"); id. at 25:25-26:1 ("And either you're gonna fuckin' be a man and own up to your shit or we move on and I find out, you know, where this dope came from.").  Before Salazar began to consistently answer their questions, Madrid and Trujillo's questions were generally not accusatory.  See Sept. 11 Tr. at 12:17-19 (Trujillo)("Well, that's, that's the whole issue is that like it doesn't add up . . . .  You know? As far as what we know."); id. at 28:2-4 (Madrid) ("All, all you have to do is point me in the right direction . . . .  Are you willing to do that?"); id. at 28:20 (Madrid)("[W]hat about the heroin, bro? Was that a mistake?").

Second, Madrid and Trujillo emphasized that they were focused on Salazar's supplier, and that, if Salazar worked with them, they were not interested in investigating his crimes.  See Sept. 11 Tr. at 17:11-12 (Madrid)("I'm tryin' to share information from, with you, bro, so you don't go back to jail, so you don't go back to prison.  So you don't become that habitual offender, bro."); id. at 17:14-15 (Madrid)("I see that you're doing bits and pieces to try to work your life, cool.  I can work with that, bro, seriously."); id. at 26:2-3 (Madrid) ("I ain't here to try to stick you . . . but I think you've got enough on your plate 'til 2021, right?"); id. at 26:23-27:1 (Madrid)("I've done my shit too but I'm not here to promise you anything, but what I can tell you is that I can fuckin' easily forget about you.  I can easily forget about you here and let you just keep goin' on with your life."); id. 27:10-12 (Madrid)("You are trying.  And I can either work with that or . . . like I said,

bro, I have no problems takin' you both, taxing you both, I have no problems.  I don't wanna do that to either of you."); id. at 33:3-6 (Madrid)("Do you wanna continue living the life that you live?  Do you just wanna finish your time by yourself with nobody fucking bothering you?  Cuz I can fuckin' easy forget about you, bro.  Or we can see each other daily."); id. at 37:12-22 (Trujillo, Salazar, Madrid).  The Court concludes that the nature of questioning between Salazar, Madrid, and Trujillo suggests that the interview was more likely an attempt to gain Salazar's cooperation with an investigation rather than a custodial interrogation.  See United States v. Jones, F.3d at 1241-42 (concluding that, even though the interrogating agents focused on Jones' order for methamphetamine ingredients, because they "obviously" wanted to get who she was selling to and sought her cooperation, this factor pointed away from finding custody); United States v. Baca, No. CR 16-1613, 2019 WL 2649835, at *55 (D.N.M. June 27, 2019)(Browning, J.)(concluding that a defendant was not in custody, in part because the interviewing agent did not accuse the defendant and focused instead "on the SNM investigation and the FBI's desire to work with [the defendant]").

Finally, Madrid and Trujillo's questioning was not prolonged.  Salazar admitted that he owed $23,000.00 to a man in Mexico for the heroin just thirty minutes into the interview.  See Recording at 29:51-30:01; Sept. 11 Tr. at 35:12-19 (Salazar, Trujillo).  The entire interview lasted approximately forty-five minutes.  See United States v. Zar, 790 F.3d 1036, 1048 (10th Cir. 2015)(concluding that a defendant was not in custody even though she had conversed with police for three hours at her kitchen table); United States v. Lamy, 521 F.3d 1257, 1263 (10th Cir. 2008)(concluding that a one-hour interview in the suspect's home was not sufficiently prolonged to require warnings under Miranda); United States v. Chee, 514 F.3d 1106, 1114 (10th Cir. 2008)(concluding that a defendant was not in custody, "especially" because his interview was less than an hour, he was told he could leave, and he left at the interview's end).  The Court concludes

that, because Salazar was not directly confronted with evidence of his guilt, Madrid and Trujillo expressed substantial interest in getting Salazar to cooperate, and the interview was relatively short, the "nature of questioning" was not such that would suggest the interview was custodial. United States v. Jones, 523 F.3d at 1240 (quoting United States v. Griffin, 7 F.3d at 1518).

The third factor that the Court analyzes is whether the "police dominate[d]" the encounter. United States v. Jones, 523 F.3d at 1240. The factors courts weigh in determining whether agents dominated the encounter are: (i) separating the suspect from others who could lend moral support; (ii) isolating the suspect in nonpublic questioning rooms; (iii) the threatening presence of multiple agents; (iv) an agent displaying weapons; (v) physical contact with the suspect; and (vi) use of language or vocal tones which suggest that compliance with an agent's request is compulsory. See United States v. Jones, 523 F.3d at 1240; United States v. Romero, 743 F. Supp. 2d at 1334 (D.N.M. 2010)(Browning, J.). Guided by these factors, the Court concludes that law enforcement did not dominate Salazar's interrogation. While Salazar was interviewed alone, the police did not separate him from another person who could lend moral support. Salazar's girlfriend drove him to the probation office, but she waited outside in the parking lot while he went in the building alone. See FOF ¶¶ 23, 25, at 6, 7; Tr. at 34:23-35:6 (Houghton, Trujillo). Salazar also told the agents that his girlfriend did not know anything about his illegal activity. See Sept. 11 Tr. at 43:11-12 (Salazar). The agents also interrogated Salazar in a nonpublic questioning room, see FOF ¶ 32, at 8, but this choice appears to have benefited Salazar as much as Madrid and Trujillo. Salazar suggested that he did not want anyone to know that police were questioning him. See Sept. 11 Tr. at 36:7 (Salazar)("I don't want [my girlfriend] to know. I don't want anybody to know."). Only two agents interrogated Salazar, and neither of them displayed their weapon or had physical contact with Salazar. See Reply at 6; FOF ¶ 29, at 7. Finally, the Court has carefully reviewed

the Sept. 11 Tr. and the Recording. Madrid and Trujillo spoke with Salazar throughout the interview in neutral, calm, conversational tones. See FOF ¶ 30, at 8. Their language when they attempt to get Salazar to take them to his supplier's house is imperative, see Sept. 11 Tr. at 45:1 (Trujillo)("Okay. You need to fuckin' take us there like . . . today. I don't know how that fuckin' . . . can get rid of your chick or what but this needs to happen today."); id. at 49:12 (Madrid)("We need to take a cruise now. Can you send your chick . . . ?"), but their language was much less domineering before Salazar confessed to owing $23,000.00 to M. Ramos-Castillo, see Sept. 11 Tr. at 35:14 (Salazar), having clean, uncut heroin, see Sept. 11 Tr. at 40:8 (Salazar), giving the price for which he sold three-gram units, see Sept. 11 Tr. at 40:17, loaning his car to M. Ramos-Castillo as collateral for the heroin, see Sept. 11 Tr. at 43:6-7, and stating that the heroin came to M. Ramos-Castillo "from Mexico straight to his house. . . . And then to us," Sept. 11 Tr. at 44:17 (Salazar). See id. at 36:3-4 (Trujillo)("Do you know here he lives? Can you take, can we go for a cruise and you can show us, point it out for us?"). The Court concludes that, because there is no evidence that Madrid and Trujillo attempted to isolate Salazar to exert undue influence over him, did not display weapons, did not physically contact him, and spoke in conversational tones, the encounter between Salazar, Madrid and Trujillo was not "police dominate[d]," United States v. Jones, 523 F.3d at 1240, even though the agents pressed Salazar at the end of the interview to take them to his supplier's house. Accordingly, the Court concludes that, because the encounter was not dominated by the police, and because Madrid and Trujillo's questioning was not likely to create a coercive environment, Salazar was not in custody for Miranda's purposes.

## II.    SALAZAR MADE HIS STATEMENTS DURING THE SEPTEMBER 11, 2018, INTERROGATION INVOLUNTARILY AND THEY WERE COERCED.

Salazar argues that Madrid and Trujillo violated his Fifth Amendment rights against self-

incrimination and due process.  <u>See</u> Motion at 17-21.  As evidence, Salazar points to the Sept. 11 Tr. where the agents (i) threatened to "tax" him and his girlfriend if he did not confess; (ii) told him they would find out he owned the drugs regardless whether he confessed; (iii) promised him leniency; (iv) implied that his failure to cooperate would result in harm to himself or his children; (v) ordered him to take them to his supplier's house; and (vi) promised to help him pay his drug debt.  <u>See</u> Motion at 17.

"To be admissible, a confession must be made freely and voluntarily; it must not be extracted by threats in violation of due process or obtained by compulsion or inducement of any sort."  <u>Griffin v. Strong</u>, 983 F.2d at 1542 (10th Cir. 1993) "[E]ven if a defendant is not subject to custodial interrogation -- and therefore not entitled to <i>Miranda</i> warnings -- his incriminating statements, if involuntarily produced, are inadmissible."  <u>United States v. Cash</u>, 733 F.3d 1264, 1280 (10th Cir. 2013).  The United States must show that the statement was voluntary by a preponderance of the evidence.  <u>See</u> <u>Missouri v. Seibert</u>, 542 U.S. at 608 n.1; <u>Lego v. Twomey</u>, 404 U.S. at 489("[T]he prosecution must prove at least by a preponderance of the evidence that the confession was voluntary."); <u>United States v. McCullah</u>, 76 F.3d at 1100.  Courts determine confessions' voluntariness based on the totality of the circumstances, which includes both the details of the interrogation and the defendant's characteristics.  <u>See</u> <u>United States v. Lopez</u>, 437 F.3d at 1063.  Accordingly, the Court now analyzes the circumstances surrounding Salazar's interrogation.

### A.    THE AGENT DISCUSSED THE VIOLENT CONSEQUENCES OF LOSING DRUGS AND OFFERED TO HELP SALAZAR PAY FOR HIS DEBTS.

Salazar argues that he involuntarily confessed, in part because Madrid and Trujillo overbore his will by describing the risks he and his children faced if he could not pay back the

money he owed to his supplier.  See Motion at 17.  The Supreme Court has twice found that raising

the threat of third party violence against a defendant, and offering protection from that violence if

the defendant confesses, is unconstitutional.   In Arizona v. Fulminante, Fulminante's friend,

Sarivola, became aware that a rumor was circulating in the prison in which they were incarcerated

that police suspected that Fulminante had killed a child.  See 499 U.S. at 283.  An FBI agent

instructed Sarivola to learn more.  See 499 U.S. at 283.  While walking with Fulminante, Sarivola

> said that he knew Fulminante was "starting to get some tough treatment and
> whatnot" from other inmates because of the rumor.  Sarivola offered to protect
> Fulminante from his fellow inmates, but told him, "'You have to tell me about it,'
> you know. I mean, in other words, 'For me to give you any help.'"

499 U.S. at 283 (citation omitted).  Fulminante then confessed to the murder.  See 499 U.S. at 283.

The Arizona Supreme Court ruled that Fulminante's confession was coerced, although the

Supreme Court granted certiorari to decide whether admitting the confession was subject to

harmless-error analysis.  See 499 F.3d at 284-85.  Before reaching the harmless-error question, the

Supreme Court discussed Fulminante's confession's voluntariness and held that, "[a]lthough the

question is a close one, we agree with the Arizona Supreme Court's conclusion that Fulminante's

confession was coerced."  499 U.S. at 287.  The Supreme Court observed that its cases "made clear

that a finding of coercion need not depend upon actual violence by a government agent; a credible

threat is sufficient."  499 U.S. at 287.  It then noted:

> As in *Payne,* where the Court found that a confession was coerced because the
> interrogating police officer had promised that if the accused confessed, the officer
> would protect the accused from an angry mob outside the jailhouse door, so too
> here, the Arizona Supreme Court found that it was fear of physical violence, absent
> protection from his friend (and Government agent) Sarivola, which motivated
> Fulminante to confess.

Arizona v. Fulminante, 499 U.S. at 288 (citation omitted).  In Payne v. Arkansas, 356 U.S. 560,

562-66 (1958), mentioned just above, an African American man with a fifth-grade education was

arrested and interrogated across three days.  The police gave him little food, no counsel, no telephone call, and forbade his family from visiting.  <u>See</u> 356 U.S. at 563-64.  "[A]n even more vital matter" for the Supreme Court was that the defendant later testified that the chief of police told him on the third day that "there was 30 or 40 people outside that wanted to get me, and he said if I would come in and tell him the truth that he would probably keep them from coming in." 356 U.S. at 564.  The Court concluded, given the totality of circumstances, "and particularly the culminating threat of mob violence, that the confession was coerced."  356 U.S. at 567.  In <u>United States v. McCullah</u>, 76 F.3d 1087, the Tenth Circuit decided a similar case to <u>Fulminante v. Arizona</u>.  In that case, the Tenth Circuit held that a resulting confession as involuntary where an informant "offered to intercede to protect" the defendant from retribution from a gang.  76 F.3d at 1101.  The Tenth Circuit noted that the case "presents a stronger example of coercion than <u>Fulminante</u> because in this case [the informant] fabricated the threat."  76 F.3d at 1101.

In this case, Madrid and Trujillo, similarly to the prison informant in <u>Fulminante v. Arizona</u> and the police chief in <u>Payne v. State of Arkansas</u>, raised the threat of physical violence by third parties against Salazar and presented themselves as saviors from it -- if he confessed.  Shortly into the interview, Madrid suggested that Salazar was facing dire consequences for misplacing drugs he had borrowed to pay for:

| | |
|---|---|
| Madrid: | You got four kids, right?  Cuz you got a newborn, right? |
| Salazar: | A newborn, yeah. |
| Madrid: | Four kids, dude. Wasn't too long ago that we handled a case down here with somebody's head cut down, off.  A guy and a girl. |
| Salazar: | I know. |

Madrid:      It wasn't too long ago before I dug up three bodies in Albuquerque, bro. So I'm tellin' you, dude, people don't play. You got a nice car, they're gonna be targeting you, man.

Sept. 11 Tr. at 18:15-20. Later, Madrid stated: "But you know what? I don't fuck people over, and I don't get people killed cuz I have a duty to protect the fuckin' kids of this community man."

Sept. 11 Tr. 25:11-12. A few minutes later, Madrid asked Salazar:

Because what's gonna happen, bro, when they come for their money for that heroin and you can't fuckin' come up with that dough even if you sell your shit, bro? What's gonna happen? You know what's gonna happen? They're gonna chop off one of your kid's head. You're gonna ask for more time and you know what they're gonna do? They're gonna hurt you bro. And they're not gonna hurt you, they're gonna hurt somebody you love, you know that.

Sept. 11 Tr. at 28:6-11. Thirty minutes into the interview, immediately before Salazar confessed to owing $23,000.00 to a man in Mexico for the heroin, Trujillo told Salazar:

So we can help your family be safe, your kids the most of all. You know? You're already an adult. You know, you and your wife. But your kids most all need the safety of clearing that debt that you owe 'em cuz I know that wasn't cheap. Right? So start off by telling me how much you paid for it, how much you owe 'em, who you get it from, what's their name, brother, all that bullshit.

Sept. 11 Tr. at 35:7-11. Finally, Madrid told Salazar that, although she had considered raiding Salazar's home, she told others that "[t]his kid . . . he knows he fucked up," and "he knows that his life is in danger" and so he would likely cooperate with any investigation. Sept. 11 Tr. at 50:14-16.

While Madrid and Trujillo suggested to Salazar that he or his children's lives were in danger if he could not pay back his debts to his drug dealers, they also promised Salazar that they could take care of his debt if he cooperated:

Trujillo:    How much do you owe the Mexicans for that dope? Cuz we can help you pay for that, if you need, so they won't come after your family.

| Madrid: | Like (snaps) that. |
|---|---|
| Trujillo: | We could get the money and fuckin' help you pay for that fuckin' dope that you owe the Mexicans. How much do you owe 'em? |
| Salazar: | A lot. |
| Madrid: | That's a fuckin' lot, bro. That ain't our fuckin' first rodeo. |
| Trujillo: | We can clear your name, Leon. We just need to know facts about how much you owe 'em and stuff. |

Recording at 27:19-27:52. Salazar resisted at first, representing that he had a bad experience cooperating with a law enforcement officer. See Sept. 11 Tr. at 33:16-34:14 (Salazar, Madrid). After assuring Salazar that this time was different, Madrid and Trujillo promised again to help him:

| Salazar: | So what do you want me to do? |
|---|---|
| Madrid: | How much do you owe the Mexicans so we can help you pay 'em, first off. |
| Trujillo: | (Unintelligible) names, what they drive, where they live, where you meet 'em, in Burque, in El Paso, in Colorado. You know, a lot of details. |

Sept. 11 Tr. at 34:15-18. As they pressed him for more details, the agents again suggested that cooperating with law enforcement would end any problems Salazar had with his supplier:

> And when we bust this fuckin' mojao, guess where he's goin'? To Mexico and he's outta your fuckin' hair. Cuz ICE will be, you work well with ICE and he's fuckin' gone. That's another thing that you won't have to worry about is he's fuckin' gone and he won't even know where the fuck it came from. Because once you point out his chante, and we go and fuckin' hit him like two, three days later, he won't even know where the fuck it came from.

Sept. 11 Tr. at 37:12-17.

To defend Madrid and Trujillo's tactics, the United States argues that the agents "simply forced him to think about the reality of his situation . . . . As this Court well knows, drug debts are often the impetus for violence. Agents merely noted that prospect for Salazar in an effort to cause

him to think through his options."  Response at 16.  The United States argues that Madrid and

Trujillo's references to Salazar's children were "morbid," but "not unconstitutional."  Response at

17.  The United States cites four cases in support, which all concern police threatening prosecution

against a suspect's family members.  See Response at 18-19 (citing United States v. Hufstetler,

782 F.3d 19, 23-24 (1st Cir. 2015)(upholding an officer's conditioning a suspect's wife's release

from custody on the suspect's confession); Loza v. Mitchell, 766 F.3d 466, 478-79 (6th Cir.

2014)(upholding a confession where police told the defendant that his pregnant wife could be

prosecuted, and both the wife and the unborn child executed, if he did not tell the truth); United

States v. Gannon, 531 F.3d 657, 661-62 (8th Cir. 2008)(upholding a confession where police told

a defendant that, unless he confessed, his wife would be charged); United States v. Johnson, 351

F.3d 254 (6th Cir. 2003)(holding that a threat to arrest a defendant's girlfriend did not make the

resulting confession involuntary if there was probable cause to arrest her)).  While Madrid and

Trujillo's comments concerning the possible ramifications of failing to repay drug debts were

vague and made by police officers during an interrogation -- the facts here are similar enough to

Arizona v. Fulminante, Payne v. State of Arkansas, and United States v. McCullah that the Court

will deem Madrid and Trujillo's comments regarding their promise to protect Salazar as weighing

in favor of concluding that his comments were coerced.

### B.    MADRID AND TRUJILLO MADE PROMISES OF LENIENCY TO SALAZAR.

Salazar also argues that Madrid and Trujillo's promises of leniency in exchange for his

cooperation made his subsequent statements involuntary.  See Motion at 17.  "'Under Supreme

Court and Tenth Circuit precedent, a promise of leniency is relevant to determining whether a

confession was involuntary and, depending on the totality of the circumstances, may render a

confession coerced.'" United States v. Lopez, 437 F.3d at 1064 (quoting Clanton v. Cooper, 129 F.3d 1147, 1159 (10th Cir. 1997)). Not every suggestion that officers will go easy on a cooperating defendant undermines a defendant's ability to make voluntary statements; the Tenth Circuit has stated that "'limited assurances'" are "permissible interrogation tactic[s]." United States v. Lopez, 437 F.3d at 1065. See United States v. Rodebaugh, 798 F.3d 1281, 1293 (10th Cir. 2015)(confession not coerced where agents told suspect "if you work with us, we'll go easy on you"); United States v. Varela, 576 F. App'x 771, 777 (10th Cir. 2014)(permitting a confession after a suspect was told "I think we can, we can do something. I'm just saying I can'' say -- I can't take those charges away [pause] right now."); United States v. Roman-Zarate, 115 F.3d 778 (concluding that a confession was voluntary where police only agreed to make the defendant's cooperation known to the United States Attorney); United States v. Lewis, 24 F.3d 79, 82 (10th Cir. 1994)(concluding that a statement was voluntary where police officer promised to make a defendant's cooperation known to the United States Attorney's Office); United States v. Lux, 905 F.2d at 1382 n.2 (concluding that a confession was voluntary where a defendant was told that he could testify or be prosecuted, but that only the United States Attorney could help her). If a "promise is of the sort that may indeed critically impair a defendant's capacity for self-determination," however, suppression of the ensuing statement is appropriate. United States v. Lopez, 437 F.3d at 1065 (suppressing a confession where a defendant was promised that "he would spend fifty-four fewer years in prison if he would confess" to killing by mistake). See Sharp v. Rohling, 793 F.3d 1216, 1230 (10th Cir. 2015).

The Court has reviewed carefully the Sept. 11 Tr. and the Recording. Many of the statements that Madrid and Trujillo make to Salazar to encourage his cooperation are vague, non-committal, "limited assurances" that fall short of promises. United States v. Lopez, 437 F.3d at

1065.  <u>See</u> Sept. 11 Tr. at 17:14-15 (Madrid)("I see that you're doing bits and pieces to try to work

your life, cool.  I can work with that, bro, seriously."); <u>id.</u> at 18:10-11 (Madrid)("I'm not gonna do

anything to get you hurt or put you in the switch or whatever.  You know what I mean?  I don't do

that, okay?  But the only person who can per, put somebody in the switch, is you, bro."); <u>id.</u> at

19:18-20 (Madrid)("I'll be honest with you, bro, if you're comfortable doing your time in jail, I'm

comfortable putting you there, bro.  But I don't wanna do that and it's simple, it's very simple.");

<u>id.</u> at 24:5 (Madrid)("I will take care of you if you need taking care of, but . . . fuckin', I don't

play."); <u>id.</u> at 26:2-4 (Madrid)("I ain't here to try to stick you (unintelligible) but I think you've

got enough on your plate 'til 2021, right?  I can work with that shit like that (snaps), they would

love that stuff.  And that's the straight up truth, bro.  I can work with that."); <u>id.</u> at 27:9-12

(Madrid)("[A]side from you failing off a little bit, I fucking get it, man.  You are trying.  And I

can either work with that or . . . like I said . . . I have no problems taking you both, taxing you both,

I have no problems.  I don't wanna do that to either of you."); <u>id.</u> at 29:3-4 (Madrid)("Like I told

you, bro, I could forget about you very easily.").  When the two first suggest that they will help

pay Salazar's heroin debt, the offer is presented, vaguely -- as something that might be possible.

<u>See</u> Sept. 11 Tr. at 33:7-8 (Trujillo)("How much do you owe the Mexicans for that dope?  Cuz we

can help you pay for that, if you need.").  At one point, Madrid even emphasized that she was not

making any promises to Salazar:

> You're not listening cuz look at me, I didn't promise you anything, bro.  So
> you're not listening.  So that tells me you, you have been fucked over, you have
> been fucked over and you know what?  I'm sorry for that.  But I'll tell you one
> thing, bro, I, I fuckin' hold people accountable.  I hold myself accountable . . . .
> Bro, I've done my shit too but I'm not here to promise you anything, but what I can
> tell you is that I can fuckin' easily forget about you.  I can easily forget about you
> here and let you just keep goin' on with your life.  Raising your kids, tryin' to get
> clean.

Sept. 11 Tr. at 26:17-27:1 (Madrid).

On the other hand, as the above paragraph's last two sentences illustrate, Madrid and Trujillo's interrogation sometimes danced along the line separating a promise and what the Tenth Circuit has articulated as a "limited assurance." United States v. Lopez, 437 F.3d at 1065. While they frequently offered only vague promises to help, other statements the two made to Salazar appear more like promises. See Sept. 11 Tr. at 18:5-8 (Madrid)("And when, I'll tell you one thing, is my word, it stands. You know what I mean? And I'm not looking for you, bro. I'm not looking for you. I'm looking for the main man, bro, the main man. And I don't, I, I don't care."); id. at 24:17-18 (Madrid)("We don't work, uh, regular investigations. We don't . . . and, uh, what happens here with us, I don't share with anybody else."). Further, when Madrid mentioned that she could help Salazar pay his debts for the second time, the offer was less non-committal than earlier. See Sept. 11 Tr. at 34:16 (Madrid)("How much do you owe the Mexicans so we can help you pay 'em, first off."). Finally, later in the interview, Salazar asked what would happen to him if he gave up his supplier. See Sept. 11 Tr. at 37:17. Madrid and Trujillo responded that, if he told the truth, he would not be bothered again:

> Madrid:     I told you, bro, if your shit pans out, I fuckin' don't even know you.
>
> Trujillo:   Clear? You fuckin' just come and do a piss test like you normally do, you're good to go. Just like normal. But you will help out the fucking community of Española Valley by doing this truthfully.

Sept. 11 Tr. at 37:18-22.

This last exchange is similar to dialogue discussed in Sharp v. Rohling, 793 F.3d at 1230, where the Tenth Circuit ruled that a defendant's confession was involuntary in an opinion the Honorable Scott Matheson, United States Circuit Judge for the Tenth Circuit, wrote and then-United States Circuit Judge Neil Gorsuch and United States Circuit Judge Harris Hartz joined. In

that case, right after confessing, a defendant asked her interrogators whether she was going to jail. See 793 F.3d at 1230. The detective replied: "'No, no, no, no, no, no, no, no, [no, no]. You are a witness to this thing so long as you do not do something dumb and jam yourself.'" 793 F.3d at 1230. The Tenth Circuit stated that this reply "was not a simple exhortation to be truthful. He had just received an incriminating answer and immediately and unequivocally reassured Ms. Sharp she was not going to jail. In short, he promised she would not go to jail despite her confession." 793 F.3d at 1230. The detective's second sentence did not "alter[] his clear promise of leniency." The Tenth Circuit held that the district court's finding that the detective had not promised leniency, but had instead merely urged the defendant to be truthful, was unreasonable. See 793 F.3d at 1230. The detective's promise of leniency rendered the defendant's subsequent statements involuntary:

> Detective Wheeles's promise she would not go to jail induced her confessional statements because he made clear there would be no cost of disclosure. He gave Ms. Sharp a get-out-of-jail-free card, and she obliged by giving him more incriminating details. Ms. Sharp therefore did not simply "balance[ ] personal considerations with the possible cost of disclosure," when making her subsequent confessional statements. Instead, his promise "[wa]s of the sort that may indeed critically impair a defendant's capacity for self-determination."

793 F.3d at 1234 (quoting United States v. Lopez, 437 F.3d at 1065)(citation omitted). The Tenth Circuit held that admitting the defendant's statements made after the detective's promise was error. See 793 F.3d at 1235.

The United States admits that Madrid and Trujillo "made promises of leniency" to Salazar. Response at 16. It argues, however, that these were not "false promises" and that the United States sought only to arrest Salazar when he was implicated in an unrelated shooting. Response at 16. Preliminarily, while due process concerns may be higher where police knowingly defraud a defendant -- a promise's effect is the same on a defendant regardless the promisor's subjective intent. Clear promises not to prosecute if a defendant confesses weigh strongly against finding

voluntariness.  See McCormick on Evid. § 155 (7th ed.)("There is general agreement that a promise of complete immunity from prosecution or its equivalent in return for a confession will render a resulting confession involuntary.").

The United States does not cite any cases supporting the argument that promises police believe at the time are not coercive.  See Response at 16.  The United States instead cites cases generally suggesting that vague, non-committal promises of leniency are not coercive.  See Response at 16 (citing United States v. Jackson, 608 F.3d 100, 103 (1st Cir. 2010)(holding that a confession was voluntary where officers made a "suggestion that cooperation might induce leniency"); United States v. Corbett, 750 F.3d 245 (2d Cir. 2014)(concluding that a confession was voluntary where a detective made a "'vague promise[] of leniency for cooperation'"); United States v. Larry, 126 F.3d 1077, 1079 (8th Cir. 1997)(per curiam); United States v. Dowell, 430 F.3d 1100, 1107-08 (10th Cir. 2005)(concluding that a confession of third party was voluntary despite federal agents repeatedly contacting third party and promising to "go easy" on him if he confessed).  The most factually on-point case the United States cites, United States v. Larry, is not strong support for the argument that the police's promises are not coercive if they intend to keep them at the time.  In a per curiam decision, the Eighth Circuit held that a defendant's statements were not involuntarily given where he was informed of his Miranda rights, not threatened or intimidated, questioned briefly, and told that he would be released from jail and not prosecuted for a drive-by shooting if he cooperated.  See United States v. Larry, 126 F.3d at 1079.  Unlike in this case, the police kept their promise that the defendant would not be prosecuted for the drive-by shooting, even though the United States eventually prosecuted the defendant under 18 U.S.C. § 922(g)(1).  See United States v. Larry, 126 F.3d at 1079.  The Court concludes, therefore, that

Madrid's promises of leniency to Salazar weigh heavily in favor of concluding that his ensuing statements were involuntary.

### C. MADRID'S THREAT TO "TAX," OR JAIL, SALAZAR AND HIS GIRLFRIEND ALSO SUGGESTS THAT SALAZAR CONFESSED INVOLUNTARILY.

Salazar also argues that Madrid's threat to "tax" Salazar and his girlfriend if he did not confess is another factor that suggests his statements were involuntary. See Motion at 17. Madrid said to Salazar:

> Fuck, look, look at what were you gonna do with this chick? Fuckin' leave her here without you, bro? That kid needs a dad. Or . . . that kid, that your chick, listen (unintelligible). I have no problems taxing you both, and that's the straight up truth, man. I've no problem taxing you and taxing your chick. No problems.

Sept. 11 Tr. at 20:8-14; Recording 11:39-12:02. Later, Madrid said: "Aside from you falling off a little bit, I fucking get it, man. You are trying. And I can either work with that or . . . like I said, bro, I have no problems takin' you both, taxing you both, I have no problems." Sept. 11 Tr. at 27:9-12. Neither party suggested what Madrid meant by saying she would "tax" Salazar and Salazar's girlfriend. No party clarified at the hearing exactly what Madrid meant. See generally Tr. at 2-185. Nor is this term clarified in the Madrid Report. See Madrid Report at 4-8.

The Court, therefore, looks to the rest of the interview for context. Elsewhere, Madrid suggests that, if Salazar does not cooperate, she would either investigate him further, see Sept. 11 Tr. at 32:22-24 (Madrid)("There are some guys in this town that when they shit, I know what is smells like, bro. That's straight up. You know why? Because that's how far I'm up, up their ass. I don't wanna be like that with you."), or put him in jail, see Sept. 11 Tr. at 17:11-12 (Madrid)("And I'm tryin' to share information from, with you, bro, so you don't go back to jail, so you don't go back to prison. So you don't become that habitual offender, bro."); id. at 19:18-

19 (Madrid)("Like I'm comfortable, I'll be honest with you bro, if you're comfortable doing your time in jail, I'm comfortable putting you there, bro."); id. at 20:4-6 (Madrid)("[W]hat's simple is that there's only gonna be one time in your life when the bus comes through and you can pick your seat because the next time the bus comes through, I'm gonna assign the seat."); id. at 21:18-22:1 (Madrid)("And you're on your third strike, you're a habitual offender . . . right?  This is gonna go to the, this, this shit potentially can go to the AUSA's office. . . . That's a lot of federal time, bro."); id. at 33:1-5 (Madrid)("[B]ut you're thinking -- do I trust this bitch or not?  And that's essentially on you, bro, because you wanna go back to fuckin' jail.").  At one point, Madrid suggests that she will jail Salazar *and* investigate him:

> I can easily forget about you here and let you just keep goin' on with your life.  Raising your kids, trying to get clean.  You're on probation.  Or I can remember you . . . and I can go visit you and I can listen to your jail calls and I can invade your privacy.

Sept. 11 Tr. at 26:24-27:6 (Madrid).  While Madrid's threats towards Salazar generally imply that she will seek his incarceration, she was more explicit when talking about what she wants to do to Salazar's girlfriend.  In fact, during the only other time that Madrid mentioned taking any action towards Salazar's girlfriend, she told Salazar: "And now what's gonna happen when you and her get locked up?  Where's that kid gonna go?"  Sept. 11 Tr. at 23:17-18.

Salazar does not mention this last threat while arguing that his statements were coerced -- instead, he relies on Madrid's threat to "tax" he and his girlfriend.  Motion at 17.  Given this explicit threat, the Court concludes that, by threatening to "tax" Salazar and his girlfriend, Madrid was threatening to jail the two.  This interpretation makes sense given other context surrounding Madrid's statements, such as Salazar's repeated statements that he wanted to help his kids, see Sept. 11 Tr. at 9:11-13; id. at 27:19 ("Just . . . just help me get my kids."); id. at 28:1 ("No, it's

that . . . I don't cry (unintelligible).  I just want my kids."); id. at 28:13-15 ("I could do whatever you guys want.  Like, I just wanna work.  I just wanna get my kids and just live a normal life."); id. at 28:17 ("All I want is my kids.  I did not do nothing to my kids."); id. at 28:21-22 ("I didn't touch nothing. (unintelligible).  Just, all I want is my kids.  I don't know how to do it.  I just wanna be happy with my girlfriend and my kids."), and Madrid's suggestion that his children needed parents in the house, see Sept. 11 Tr. at 20:9-12; id. at 23:17-18; id. at 24:4.

Threats to arrest a family member do not render an ensuing confession voluntary where police have probable cause to arrest the family member.  See United States v. Johnson, 351 F.3d 254 (6th Cir. 2003); Thompson v. Haley, 255 F.3d 1292, 1297 (11th Cir. 2001)(citing Martin v. Kemp, 760 F.2d 1244, 1247-48 (11th Cir. 1985)); United States v. Ortiz, 943 F. Supp. 2d 447, 456-57 (S.D.N.Y. 2013)(Sullivan, J.)(collecting cases and noting that, while the United States Court of Appeals for the Second Circuit has not addressed this question, other Courts of Appeal and several district courts "have all reached a similar conclusion").  The United States has not produced evidence that Madrid and Trujillo had probable cause to arrest Salazar's girlfriend.  See generally Tr. at 2-185; Response at 1-20.  Nor does the Court find any evidence to support probable cause in the record.  Madrid's threat that she had no problem "taxing" Salazar and his girlfriend, Sept. 11 Tr. at 20:13, id. at 27:11, and her suggestion that Salazar's girlfriend would "locked up," Sept. 11 Tr. at 23:17, counsel in favor of concluding that Salazar involuntarily confessed.

### D.  AGENTS TOLD TRUJILLO THEY WOULD FIND OUT THAT HE OWNED THE DRUGS REGARDLESS.

Salazar also argues that he involuntarily confessed, because Madrid and Trujillo "told him that they would find out that he owned the drug package regardless."  Motion at 17.  Salazar does not specifically cite statements Madrid and Trujillo made.  Shortly into the interview, however,

Madrid told Salazar: "You know that in the end . . . we find out . . . who . . . what things belong to, right?  And who things belong to, right?"  Sept. 11 Tr. at 16:7-15.  In the Tenth Circuit, "it is well-settled that a confession is not considered coerced merely because the police misrepresented to a suspect the strength of the evidence against him."  Clanton v. Cooper, 129 F.3d at 1158.  The Tenth Circuit has ruled that a defendant's confession "was not coerced just because [an officer] falsely told [the defendant] that physical evidence connected him to the crime."  Clanton v. Cooper, 129 F.3d at 1158.  Where Madrid and Trujillo did not assert that they had any evidence against Salazar, see Sept. 11 Tr. at 7:8 (Madrid)("Is your DNA gonna come back on my package?"); id. at 8:6-9:2 (Madrid, Salazar), and merely said that they would eventually get it, the Court concludes that their statements concerning the strength of the case were not coercive and will disregard them in analyzing whether Madrid and Trujillo were improperly coercive.

### E.  OTHER FACTORS WEIGH SLIGHTLY AGAINST CONCLUDING THAT SALAZAR CONFESSED INVOLUNTARILY.

The United States concludes by providing several factors that suggest Salazar voluntarily confessed.  The United States argues that his confession was voluntary, because

> the location was one which Salazar was familiar, the location was not locked or otherwise connected to a law enforcement building, officers were unarmed and in plainclothes, officers spoke to Salazar in a normal volume, Salazar was not placed in handcuffs or otherwise detained; Salazar moved around the room freely; Salazar was closest to the unlocked door; Salazar decided to confess after only a half hour; and Salazar was familiar with the criminal justice system, as well as one of the officers.

Response at 19-20.  The United States is correct that these factors weigh against concluding that Salazar involuntarily confessed.  See, e.g., Carter v. Bigelow, 787 F.3d 1269, 1295 (10th Cir. 2015)(noting that questioning was no unusually rigorous where a defendant was interrogated for eight to ten hours across two days); United States v. Cash, 733 F.3d 1264 (10th Cir. 2013)(noting that a police officer threatened no physical coercion); United States v. Erving L., 147 F.3d 1240,

1249 (10th Cir. 1998) (noting while analyzing the totality of circumstances that a confession occurred at home); United States v. Perdue, 8 F.3d 1455, 1466-67 (10th Cir. 1993)(concluding that a defendant made involuntary statements, in part because officers stood above him with guns drawn during the questioning). On the other hand, that Madrid and Trujillo did not read Salazar his Miranda rights, however, weighs in favor of concluding Salazar's confession was improperly coerced. See generally Sept. 11 Tr. at 1-55. See also Carter v. Bigelow, 787 F.3d at 1295; United States v. Toles, 297 F.3d 959, 966 (10th Cir. 2002); United States v. Short, 947 F.2d 1445, 1450 (10th Cir. 1991). In total, the above miscellaneous factors weigh slightly against concluding that Salazar confessed involuntarily.

F. **SALAZAR'S PERSONAL CHARACTERISTICS DO NOT INDICATE HE IS UNUSUALLY SUSCEPTIBLE TO COERCION.**

If a court concludes that an interrogator's conduct was coercive, the court then analyzes the defendant's personal characteristics. See United States v. Lopez, 437 F.3d at 1064; United States v. Erving L., 147 F.3d at 1249. The defendant in United States v. Lopez was thirty-three years old, had completed the eleventh grade, and "had been arrested and given Miranda warnings on earlier occasions." 437 F.3d at 1065. The Tenth Circuit concluded, therefore, that the defendant's personal characteristics "do not suggest he was unusually susceptible to coercion." 437 F.3d at 1066.

The record reflects that Salazar was in his early thirties at the time the interview took place, see Salazar's Criminal History at 4, but the United States has produced little else suggesting that Salazar's age, intelligence, or education makes him susceptible to coercion. See United States v. Lopez, 437 F.3d at 1065 ("The record contains little evidence to indicate that Lopez 'was unusually susceptible to coercion because of age, lack of education, or intelligence." (quoting United States

v. Toles, 297 F.3d at 966)). The United States argues that Salazar's "lengthy criminal record is a heavy factor" that the Court should consider. Response at 19 (citing United States v. Burson, 531 F.3d 1254, 1259 (10th Cir. 2008)(evaluating a Miranda waiver's voluntariness); United States v. Williams, 612 F.3d 417, 422 (6th Cir. 2010); United States v. Pruden, 398 F.3d 241, 246 (3d Cir. 2005)). The United States argues that Salazar's "extensive history of interacting with law enforcement officers" has given him a "high capacity to resist any pressure they may exert during an interview." Response at 19. Salazar has been arrested several times, and he has served one year in prison. See Salazar's Criminal History at 1-3. The United States produced evidence showing that Salazar has previously been advised of his Miranda rights, and, on at least one previous occasion, invoked his right to have an attorney present after receiving Miranda warnings. See United States v. Lopez, 437 F.3d at 1065; United States v. Toles, 297 F.3d at 966. As in United States v. Lopez, the Court concludes that in light of this personal history, Salazar's personal characteristics "do not suggest he was unusually susceptible to coercion." 437 F.3d at 1066.

### G. MADRID AND TRUJILLO'S INTERROGATION OVERBORE SALAZAR'S WILL.

The Court concludes that Salazar's will was "'overborne'" during the September 11, 2018, interview with Madrid and Trujillo. United States v. Perdue, 8 F.3d at 1466 (quoting Culombe v. Connecticut, 367 U.S. 568, 602 (1961)). Although Salazar's personal characteristics do not suggest that he is especially susceptible to coercion, and the interview was non-custodial in nature, other factors suggest that Madrid and Trujillo improperly coerced Salazar. See United States v. Lopez, 437 F.3d at 1066 (concluding that an interrogation as unconstitutionally coercive even though the defendant's personal characteristics did not suggest he was unusually susceptible). To obtain Salazar's confession, Madrid and Trujillo promised him leniency, offered themselves as

protection for Salazar and his children against violent retribution from his drug-dealer, and threatened to incarcerate his girlfriend. Each of these factors' occurrence during an interrogation has led courts to suppress a defendant's statements. See Sharp v. Rohling, 793 F.3d at 1230; United States v. McCullah, 76 F.3d at 1100; Martin v. Kemp, 760 F.2d at 1248. Salazar's interrogation was even more coercive, because he was not read his Miranda rights or otherwise told he could end questioning at any time. See, e.g., Carter v. Bigelow, 787 F.3d at 1295. The Recording and Sept. 11 Tr. confirm the Court's conclusion that Madrid and Trujillo overbore Salazar's will. Salazar began weeping nineteen minutes into the interview as Madrid's three coercive tactics converged at once. See Sept. 11 Tr. 28:5; Recording at 19:10-20:20. Soon after, Salazar demonstrated willingness to answer whatever questions Madrid and Trujillo asked. See Sept. 11 Tr. 29:2 (Salazar)("What do you want?"); id. at 34:15 (Salazar)("So what do you want me to do?"). Accordingly, the Court concludes that it must suppress Salazar's statements that he made during his September 11, 2018, interrogation, because they resulted from improper, coercive pressure from Madrid and Trujillo.

## III.   THE COURT WILL NOT SUPPRESS SALAZAR'S SEPTEMBER 14, 2018, INTERVIEW.

The Court will not suppress statements Salazar made during his September 14, 2018, interview with Madrid and Trujillo. Where a previous interview produced an involuntary confession, a later confession's admissibility depends on whether the "'coercion surrounding the first [confession] had been sufficiently dissipated so as to make the second statement voluntary.'" United States v. Lopez, 437 F.3d at 1066 (quoting United States v. Perdue, 8 F.3d at 1467)(alteration in original). The government must show "'intervening circumstances which indicate that the second confession was insulated from the effect of all that went before.'" United

States v. Lopez, 437 F.3d at 1066 (quoting United States v. Perdue, 8 F.3d at 1467-68).  "This 'depends on the inferences as to the continuing effect of the coercive practices which may fairly be drawn from the surrounding circumstances.'"  United States v. Lopez, 437 F.3d at 1066 (quoting Lyons v. Oklahoma, 322 U.S. 596, 602 (1944)).

In Oregon v. Elstad, 470 U.S. 298, the Supreme Court held that, where a confession obtained in violation of Miranda leads a defendant to make second confession, the second confession is admissible.  470 U.S at 1298.  Nevertheless, there is a substantial difference between a confession that is obtained in violation of the Constitution's Due Process clause and a confession that was given without a Miranda warning.  See Oregon v. Elstad, 470 U.S. at 312 ("There is a vast difference between the direct consequences flowing from coercion of a confession by physical violence or other deliberate means calculated to break the suspect's will and the uncertain consequences of disclosure of a 'guilty secret' freely given in response to an unwarned but noncoercive question."); id. at 318 ("The relevant inquiry is whether, in fact, the second statement was also voluntarily made."); 1 Crim. Prac. Manual § 27:3, "Due Process" vs. Miranda: the difference in consequences.  Thus, courts may apply the fruit of the poisonous tree doctrine to exclude a second confession obtained after an "actual violation[] of the Due Process Clause or the Self-Incrimination Clause."  United States v. Patane, 542 U.S. at 642.

The Tenth Circuit has addressed the voluntariness of a confession made after an involuntary confession several times.  See United States v. Lopez, 437 F.3d at 1066-67; United States v. Perdue, 8 F.3d at 1467-69; Mapys v. United States, 409 F.2d 964 (10th Cir. 1969).  In United States v. Perdue, the Tenth Circuit held that a later confession was improperly admitted at trial after it concluded that the "tense and coercive atmosphere" from the first, coercive interrogation also pervaded the defendant's second interrogation.  8 F.3d at 1468.  The second

interrogation occurred "only minutes after" the first interrogation. 8 F.3d at 1468. The defendant was handcuffed and led on foot "only a short distance" away from where police had initially interrogated him. 8 F.3d at 1468. The defendant was re-interrogated while fifteen police officers moved around the area, helicopters hovered overhead, and his pregnant fiancée cried in front of him. 8 F.3d at 1468. The Tenth Circuit concluded that, "[g]iven the immediacy of the second phase of the interrogation and the surrounding circumstances, no intervening cause readily appears to demonstrate that this later phase was insulated from the shock and coercion that marked the initial encounter." 8 F.3d at 1468. The Tenth Circuit also concluded that a second confession was inadmissible in United States v. Lopez, 437 F.3d at 1066. It stated that the coercion that produced the first confession had not dissipated, because the same agents that had improperly promised leniency and misrepresented their evidence were again the primary interrogators, the interrogation took place in the same location, the defendant had not spoken to an attorney or family member since he had been arrested twenty-four hours earlier, and there was no indication that any police officer "made any statements to [the defendant] that might have dissipated the coercive effect" of the earlier promises of leniency and the misrepresentation of the evidence. 437 F.3d at 1067. It reached this conclusion "although" the later confession "came after a night's sleep and a meal, and almost twelve hours elapsed between confessions." 437 F.3d at 1066.

Here, the three days Salazar spent outside police custody between his two confessions weighs heavily in favor of a conclusion that the coercive pressure of his first interrogation had dissipated. He had the opportunity, if he chose, to consult with family members or a lawyer during this period. See Darwin v. Connecticut, 391 U.S. 346, 349 (1968)(concluding that a second confession as involuntary where "denial of access to counsel and the outside world" continued between a defendant's confessions on Saturday and Sunday); Reck v. Pate, 367 U.S. 433, 444

(1961)(concluding that a second confession one day later was involuntary where the defendant remained in police custody, went without a judicial hearing, was subjected to further interrogation, and "did not see counsel, family or friends" between the two confessions); Leyra v. Denno, 347 U.S. 556, 561 (1954)(holding that confessions were involuntary when they were "extracted in the same place within a period of about five hours as the climax of days and nights of intermittent, intensive police questioning."). He was, as promised, released after his confession and not arrested. See FOF ¶ 135, at 25. Salazar's stubborn refusal three days later to admit either that he had confessed or that he had recently bought heroin illustrates that Madrid and Trujillo's coercion had dissipated. See, e.g., Sept. 14 Tr. at 2:1, id. at 4:14; id. at 5:11 ("What heroin? No, I didn't admit to no heroin. I haven't touched heroin."); id. at 17:2 ("I didn't get no heroin."). Further, Madrid and Trujillo extracted Salazar's September 11, 2018, confession with promises of leniency and protection for Salazar's family, and with threats to jail his girlfriend. Salazar nevertheless ignored Madrid's subsequent efforts to contact him, see FOF ¶ 137, at 25, strongly suggesting that he was no longer concerned with her help or worried by her threats. While Madrid and Trujillo re-interrogated Salazar on September 14, 2018, and made no statements "that might have dissipated the coercive effect" of their previous interrogation, United States v. Lopez, 437 F.3d at 1067, the Court concludes that the three days Salazar spent free between his two interrogations is a sufficient "break in the stream of events" to render his September 14, 2018, statements voluntary. Clewis v. Texas, 386 U.S. 707, 710 (1967).

**IT IS ORDERED** that the Defendant's Opposed Sealed Motion to Suppress Evidence, filed November 21, 2018 (Doc. 18), is granted in part and denied in part. The Court will suppress Defendant Salazar's September 11, 2018, statements and any evidence derived from them but will admit his September 14, 2018, statements.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

John C. Anderson
   United States Attorney
Kristopher N. Houghton
Matthew Thomas Nelson
   Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

     *Attorneys for the Plaintiff*

Marshall Ray
Law Offices of Marshall J. Ray, LLC
Albuquerque, New Mexico

     *Attorney for the Defendant*